Private Frank L. **HUFF** et al.

v.

**SECRETARY OF the NAVY et al., Appellants.**

No. 76–1828.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1977.

Decided March 15, 1978.

Rehearing and Rehearing En Banc Denied May 15, 1978.

Neil A. Kaplan, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellants. Derek I. Meier, Asst. U. S. Atty., Morton Hollander, Robert E. Kopp, Donald Etra, Attys., Dept. of Justice, Washington, D. C., also entered appearances for appellants.

Alan Dranitzke, Washington, D. C., with whom David Addlestone, Washington, D. C., was on the brief, for appellees.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

Opinion filed by Circuit Judge TAMM, concurring in part and dissenting in part.

McGOWAN, Circuit Judge:

This is an appeal from a judgment of the District Court enjoining the enforcement at the Marine Corps Air Station in Iwakuni, Japan of certain Marine Corps and Navy regulations which require prior approval for the circulation by military personnel of, *inter alia,* petitions to members of Congress. 413 F.Supp. 863 (1976). The District Court declared the regulations violative of both the first amendment and 10 U.S.C. § 1034 (1970) insofar as they apply to materials distributed on-base during off-hours and away from restricted or work areas. For the reasons appearing herein, and by reference to the statutory, as distinct from the constitutional, ground, we affirm the District Court's judgment insofar as it relates to petitions, and vacate it insofar as it extends to other materials unrelated to the petitioning process.

I

The procedural posture of this appeal is complicated in two respects. We describe them in some detail in order that the precise issue addressed and decided in this opinion may be identified and understood.

The first complication relates to the nature of the attack upon the regulations. This challenge was certified by the District Court as a class action on behalf of all members of the Marine Corps assigned to the Iwakuni Air Station. Each of the three

named plaintiffs had sought and largely been denied approval to circulate, on and off-base, petitions and certain related materials. Two of these plaintiffs nevertheless undertook such distribution; both were arrested and one was convicted in a court-martial. On cross-motions for summary judgment, the District Court upheld the regulations as they pertain to off-base distribution of materials in a foreign country, and therefore denied the named plaintiffs' request for injunctive relief relating to the arrests and court-martial for unauthorized off-base distribution.[1] Appellees have not cross-appealed from this portion of the District Court's judgment; and the issue of prior approval for off-base distribution of written materials generally is therefore not before us on this appeal.

However, the District Court did grant declaratory and injunctive relief to both the named plaintiffs and the class with respect to on-base distribution. The Court held that the challenged regulations constitute an unlawful prior restraint upon circulation of materials by service personnel away from restricted areas during off-duty hours. Appellant armed forces officials have conceded, both in the District Court and on this appeal, that the specific requests for on-base distribution made by the named plaintiffs should not have been denied under the applicable regulations.[2] However, appellants do contest the broad holding that the system of prior restraint imposed by the regulations is itself invalid. Thus, the question presented on this appeal is whether the challenged regulations are facially invalid insofar as they require prior approval for off-duty, on-base distribution in non-work areas.

The second complication relates to the particular type of activity upon which the

1. The District Court held that because off-base political activity could violate the Status of Forces Agreement between the United States and Japan, which restricts political activities of members of our armed forces in Japan, a system of prior restraint with respect to such activity was reasonable.

2. The complaint states four instances in which appellees were denied permission to distribute materials on-base. On May 2, 1974, appellee Huff requested permission to solicit signatures on a petition addressed to Senator Cranston, objecting to the use in labor disputes of military and national guard personnel. On May 8, 1974, appellee Falatine requested permission to solicit signatures for a petition to Congressman Dellums, supporting universal and unconditional amnesty for those who resisted the draft or were deserters during the Vietnam war. On May 20, 1974, both these requests were denied on the ground, inter alia, that they impugned "by innuendo the motives and conduct of the Commander-in-Chief."

Their petitioning requests having been denied, Huff and Falatine on June 24, 1974, each sought permission to circulate a leaflet entitled "We hold these Truths to be Self-Evident (But Do the Brass?)." The leaflet contained the first amendment and portions of the Declaration of Independence (with "modern interpretation[s]" thereof), and an introductory paragraph which read:

In two years our country will have its 200th birthday. Many of the basic principles our country was founded upon like the Declaration of Independence and the First Amendment are really "Right On". Yet many of our "superiors" call anyone who tries to exercise his First Amendment right to freedom of speech and press a "communist". They also put down anyone who really believes in our Declaration of Independence which upholds the right of the citizens of any country to change their government when it becomes unresponsive to their needs and the idea that the people of a country should be able to choose their own form of government even if the leaders of our government disagree with their choice.

Huff's request to distribute the leaflet off-base was granted, but Falatine's request for on-base distribution was denied, on the ground that "[t]he introductory paragraph is, by transparent implication, disrespectful and contemptuous of all your superiors, officers, non-commissioned officers and civilians alike."

Finally, on July 30, 1974, appellees Huff, Falatine, and Gabrielson requested permission to distribute a letter to Senator Fulbright, objecting to American support of the regime in South Korea. Huff, Falatine, and three other Marines had been arrested on July 12, 1974 for distributing this same letter off-base without prior approval, and the three July 30 requests sought to distribute a statement concerning the upcoming court-martials of those arrested on July 12, as well as copies of the Fulbright letter itself. Although Huff's and Falatine's requests for on-base distribution were granted, Gabrielson was denied permission to distribute the material in the barracks.

regulations are alleged to be an unlawful prior restraint. The regulations broadly apply to "originat[ing], sign[ing], distribut[ing], circulat[ing] or promulgat[ing] petitions, publications . . . pamphlets, newspapers, magazines, handbills, flyers or other similar printed or written material,"[3] and the District Court's order applies with equal breadth to any distribution of any material in the on-base context heretofore described. However, we believe that this appeal can and should be resolved by reference only to that activity which is the focal point of both the regulations and the requests made by the named plaintiffs, namely, petitioning by servicemen of members of Congress.

Petitions are the first type of material mentioned in the regulations, and petitions are the only type of material to which all the activities proscribed (originating, signing, distributing, circulating and promulgating) can literally apply. Three of the four requests for permission to distribute on-base described in the complaint directly involved petitions to members of Congress.[4] The fourth request as well appears to have borne a close and clearly derivative relationship to these frustrated petitioning efforts. That request—to distribute a leaflet quoting the first amendment and portions of the Declaration of Independence—was made by two appellees who had each shortly before been denied permission to circulate petitions. The "modern interpretation" of the first amendment contained in the leaflet included the statement that "the government cannot take away our right to circulate petitions," and the title of the leaflet and introductory paragraph indicate that its purpose was to declare the view that commanding officers, who had denied the requests, were not acting consistently with the principles of the first amendment and the Declaration of Independence. See note 2 *supra.*

The causal connection between the initial unsuccessful attempts to circulate petitions, on the one hand, and the subsequent request to distribute the Declaration of Independence, on the other, is even more apparent when one considers that a principal grievance stated in the Declaration itself was that

> [i]n every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury.

The Signers of the Declaration felt compelled to state their grievances to the world after those in authority rebuffed their petitions and other efforts to resolve those grievances. Appellees in this case, blocked in their attempts to petition the Congress, sought in aid of those attempts to point out that refusal to allow such petitions appeared to violate the principles stated in the Declaration.[5]

Thus we consider that the record illuminates in concrete factual terms only the question of the validity of the regulations as they pertain to activity directed towards the petitioning of Congress. Finding, as we do, that prior restraint in such a case is at odds with the statutory command of Congress, we believe the essential grievance suffered in this case is met by limiting declaratory and injunctive relief to the petitioning context. The availability of such relief always resides in the sound discretion of the court,[6] and we see neither the necessity nor the desirability of reaching on this record the question of the facial validity of

---

3. See text accompanying note 11 *infra.*

4. The material sought to be distributed by appellee Gabrielson included both a letter to a congressman and a statement concerning arrests of other Marines for previously distributing the letter without prior approval. See note 2 *supra.*

5. See note 2 *supra.*

6. See *Great Lakes Co. v. Huffman,* 319 U.S. 293, 299–300, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (Supp. VI 1976).

the regulations with respect to materials other than petitions to Congress.

## II

The four challenged regulations, all of which have the same operative language, differ only in the scope of the geographic area to which they apply. Thus, the regulations are in the form of a Pacific Fleet Instruction,[7] a Fleet Marine Force Pacific Order,[8] a First Marine Aircraft Wing Order,[9] and a Iwakuni Marine Corps Air Station order.[10] The operative language states that Marine Corps personnel within the relevant command area shall not

> originate, sign, distribute, or promulgate petitions, publications, including pamphlets, newspapers, magazines, handbills, flyers, or other printed or written material, on board any ship, craft, aircraft, or in any vehicle of the Department of the Navy, or any military installation on duty or in uniform, or anywhere within a foreign country irrespective of uniform or duty status, unless prior command approval is obtained.[11]

This requirement clearly constitutes a prior restraint upon petitions to Congress. Indeed, the requirement of command authorization is interposed at every stage of the petitioning process, from drafting the document to circulating it to signing it.[12]

Were we considering the validity of this restraint under the first amendment,

the next step in that consideration would be to examine the standards which guide commanders in deciding whether to authorize petitioning activities. In the civilian context the standards would have to be narrow, objective, and definite, see *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and there would be "a heavy presumption against [the] constitutional validity" of the system of censorship implemented by the challenged regulations. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). However, "the different character of the military community and of the military mission . . . may render permissible within the military that which would be constitutionally impermissible outside it," *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974). Under this more lenient constitutional standard applicable to restrictions on first amendment rights within the military sphere, the presumption against prior restraints would not be as great as it is in the civilian context; and we would be required to undertake a careful balancing of competing first amendment interests and military requirements.

Although the District Court in this instance, and other courts presented with the same issue as that raised on this appeal,[13] have undertaken the foregoing first amendment analysis, we believe that it is neither necessary nor proper to do so because the validity of the challenged regulations, inso-

---

7. CINCPACFLTINST 5440.3c (1974).

8. FMFO 5370.3 (1974).

9. MAWO 5370.1A (1973).

10. MCASO 5370.3A (1973).

11. FMPO 5370.3 (1974).

12. In October of 1974, MAWO 5370.1A and MCASO 5370.3A were altered slightly to exclude the term "originate."

13. *Allen v. Monger,* 404 F.Supp. 1081 (N.D.Cal. 1975) (Peckham, J.), *appeal pending,* 9th Cir.

No. 76–125; *Glines v. Wade,* 401 F.Supp. 127 (N.D.Cal.1975) (Orrick, J.) *appeal pending,* 9th Cir. No. 76–1412. Both these decisions found the challenged regulations invalid on constitutional and statutory grounds, both facially and as applied. The only other decision which has directly passed upon the validity of prior restrictions on petitioning activity is *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975). This court there upheld the regulations as applied in that case, which involved combat zone bases during the Vietnam war. However, the court did note that it "entertain[ed] significant doubts" about the facial validity of the regulations, *id.* at 325, 511 F.2d at 1333.

far as they pertain to petitioning activities, can be determined on statutory grounds.

10 U.S.C. § 1034 (1970) provides that [n]o person may restrict any member of an armed force from communicating with a member of Congress, unless the communication is unlawful or violates regulations necessary to the security of the United States.

In enacting this statute, Congress has eased the task of the courts in evaluating the validity of military restrictions on the right to petition. The statute not only indicates that free and unrestricted communication by members of the armed forces with the Congress or members thereof is of particular concern to the legislative branch, but also commands that such communication be subject to additional protection beyond that afforded other kinds of speech by the first amendment. Whatever standards may be held to apply generally to restrictions on speech within the military, the standards to be applied to restrictions on petitioning and related activity cannot be less stringent than those provided in § 1034. Thus, the statute represents a legislative evaluation of the competing interest in free expression of views to members of Congress, on the one hand, and the special requirements of the military, on the other. The difficult balancing which would otherwise have to be accomplished by the judiciary has been legislatively resolved: restrictions imposed upon lawful communication to Congress

must be "necessary" to the national security. .

The regulations involved in this case constitute in terms restrictions on communications with members of Congress. The legislative history of § 1034 confirms that Congress sought by this legislation to prohibit military commanders from interfering with communications to members of Congress *in advance* of the actual sending of the communications.[14] A system of prior restraint—as opposed, for instance, to the *post hoc* imposition of penalties for scurrilous, obscene, mendacious, or other improper communications—is precisely what Congress intended to prohibit, subject to the limited exceptions noted in the statute.

■ The Government contends, however, that the statute quoted above was intended to protect only letters by individuals to members of Congress.[15] We think the legislative history indeed leaves no doubt that the right to present a solitary, individual grievance to a member of Congress is encompassed by § 1034.[16] But there is no indication that this is the outer limit of the communication which Congress sought to protect in passing this legislation. We agree with the Secretary of Defense that § 1034 protects also the right to *petition* members of Congress. In a Directive entitled "Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces," he stated:

14. The provision was originally enacted in 1951 as an amendment to the Universal Military Training and Service Act. C. 144, § 1(d), 65 Stat. 78. The amendment was offered by Congressman Byrnes of Wisconsin in order to counteract military regulations which required that communications to Congress be sent "through official channels." In support of his amendment, Congress Byrnes stated:

I will admit . . . that there is no restriction on [the] right to send communications through channels, but anybody knows that that certainly is a restriction in and of itself. 97 Cong.Rec. p. 3776, April 12, 1951. Minor changes in wording were made when the statute was recodified in 1956. C. 1041, 70A Stat. 80.

15. The opinion in *Carlson v. Schlesinger, supra,* 167 U.S.App.D.C. 325, 511 F.2d at 1333, may

also have intimated that § 1034 protects only the right to send individual letters to Congress. While the "national security" exception to the statute may narrow the nature of petitioning activities protected in a combat zone such as was involved in *Carlson,* we do not think and do not read the dicta in *Carlson* as implying that individual letter-writing is the only activity protected under § 1034 at a base such as Iwakuni.

16. When asked whether the purpose of the amendment was "to permit any man who is inducted to sit down and take a pencil and paper and write to his Congressman or Senator," the sponsor of the amendment replied, "That is right." 97 Cong.Rec. p. 3776, April 12, 1951.

The right of members to complain and request redress of grievances against actions of their commander is protected by Article 138 of the Uniform Code of Military Justice. *In addition, a member may petition or present any grievance to any member of Congress (10 U.S.C. § 1034).* D.O.D. Directive No. 1325.6, § III G (1969) (emphasis added). We would suppose that quite often a soldier's intended communication with Congress could not effectively be accomplished through solitary letters, as, for instance, when the objective is to communicate widespread dissatisfaction concerning a particular grievance, rather than merely the grievance itself. We also note that the system of prior restraint at issue in this case evidently applies not only to petitions but also to their next of kin, coordinated mailing campaigns utilizing preprinted forms or letters containing identical messages. The distribution of such material would appear to be subject to prior approval.

Particularly in view of the long and cherished tradition in this country, embodied in the first amendment (". . . the right *of the people peaceably to assemble, and to petition Congress* for a redress of grievances"), of collective presentation of grievances to those in authority in the form of petitions, we think it most unlikely that in protecting the right to communicate grievances to Congress, Congress did not intend to protect the right to solicit others to sign such communications.

Having concluded that the petitioning activities restricted in this instance by the challenged regulations are communications to members of Congress within the meaning of § 1034, our next task is to determine whether the system of prior restraint at issue falls within one of the exceptions to the general prohibition of that statute. It is not seriously contended that the materials in issue here were "unlawful," within the meaning of that term as used in § 1034, by reason of their particular content. The statute also states, however, that prior restraint is not prohibited where the communication thus restricted "violates regulations necessary to the security of the United States." Thus the question we face is whether the regulations requiring prior approval of petitions to Congress on the Iwakuni Air Station are necessary to the security of the United States.

We note that this is not the way that courts in the two other cases involving the facial validity of similar military restrictions on petitions have framed the statutory question before them.[17] Rather than determining whether the system of prior restraint in the particular circumstances before them is within the national security exception to § 1034, these courts have measured the standard of "national security" against the guidelines which armed forces personnel have set down to guide commanding officers in granting or denying requests to distribute. In both this case and the other two cases concerning restraints on petitioning activities, the guidelines essentially state that permission to distribute should be denied if the petition at issue presents "a clear danger to the loyalty, discipline, morale or safety" of service personnel, or if it advocates unlawful behavior.[18]

---

17. *See Allen v. Monger, supra* 404 F.Supp. at 1090 (¶ 8); *Glines v. Wade, supra* 401 F.Supp. at 130–31. The District Court, however, properly phrased the question as whether "the very system of prior restraints . . . is unconstitutionally restrictive of First Amendment freedoms." 413 F.Supp. at 868.

18. Commanders are told to deny permission to distribute if such distribution would
   (1) Materially interfere with the safety, operation, command or control of his unit, or the assigned duties of particular members of the command; or,

(2) Present a clear danger to the loyalty, discipline, morale or safety to personnel of his command; or,
(3) Involve distribution of material or the rendering of advice or counsel that causes, attempts to cause, or advocates, insubordination, disloyalty, mutiny, refusal of duty, solicits pornographic material, or comprises, advocates, or solicits violation of international treaties or agreements; or,
(4) Involve the planning or perpetration of an unlawful act or acts.
MAWO 5370.1A. Nearly identical guidelines are stated in the other regulations challenged

■ The holdings in the other two cases that these guidelines are broader than the statutory national security exception address a question which, in our view, need not be reached. The particular guidelines which armed forces personnel have set down to guide commanding officers in granting or denying requests to distribute assume relevance only if it is first determined that the basic system of prior approval for any petitioning activity is itself "necessary to the security of the United States." *If* this determination were affirmative, *then* we would face the issue of whether the standards set out in the guidelines for rejection of requests are also commensurate with the statutory standard. Refusal to grant a request to distribute is a *second, separate* restriction in addition to the universally applicable restriction which takes the form of a system of prior restraint. We emphasize again that when Congress prohibited restrictions on communications with Congress, it clearly intended this prohibition to apply to a system of prior approval itself.

■ We conclude that no showing has been made that a system of prior restraint on petitioning activities on the Iwakuni Air Station is necessary to the national security. The findings of the District Court with respect to the nature of the military mission at the base are not extensive, but it is clear that the station is not in an actual and current combat zone. While an affidavit introduced in the Court below states that the base is "combat-ready," there are no combat activities performed by base personnel during peacetime.[19] We understand that order and discipline might be more tightly maintained were commanders given the opportunity to screen petitions prior to their circulation, but we do not think that the national security can be said to require that the objective of military discipline be pursued to the exclusion of all other interests. If this were the case, then § 1034 would be a nullity, for restrictions on peti-

tioning activity, as on other types of speech, can always be said to decrease the possibility of lapses of military discipline. We agree with the District Court that as long as the on-base petitioning activity is performed away from restricted or work areas during off-duty hours, there should be no prior approval required for these activities because such approval is not "necessary to the national security."

Our invalidation of the system of prior restraint on petitions to Congress at the Iwakuni Air Station does not leave military commanders without recourse against service personnel who initiate petitions which prove to be improper in their content. *See* p. —— of 188 U.S.App.D.C., p. 912 of 575 F.2d supra. Those who undertake such petitioning may be punished under applicable provisions of the Code of Military Justice or under applicable criminal law. It is the system of prior restraint on petitions to Congress which is incompatible with § 1034.

III

The Government has strenuously argued that this case is controlled by the Supreme Court's decision in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). We respond to this argument at some length because we think it is based on important misconceptions about the scope of the holdings in that case. The major portion of the *Greer* opinion related to the holding that the absolute ban on political demonstrations at Fort Dix, New Jersey was constitutionally permissible, a holding not directly relevant to the statutory issue before us relating to petitioning Congress. However, *Greer* also held that the first amendment rights of the civilian plaintiffs were not violated by another regulation which prohibited them from distributing political campaign literature at the base without prior command approval. Because the plaintiffs in *Greer* had not presented their literature for prior approval, the Court did not face the issue of whether the regulation

---

on this appeal. *See also Allen v. Monger, su-pra* 404 F.Supp. at 1086 (¶ 10); *Glines v. Wade, supra* 401 F.Supp. at 131.

**19.** *See* 413 F.Supp. at 867–68.

was constitutional as applied; rather, the Court held that the challenged regulation was not facially invalid, *id.* at 838–840, 96 S.Ct. 1211.

The regulation in *Greer* authorizing prior restraint read as follows:

The distribution or posting of any publication, including newspapers, magazines, handbills, flyers, circulars, pamphlets or other writings, issued, published or otherwise prepared by any person  .  .  . is prohibited on the Fort Dix Military Reservation without prior approval .  . .

*Id.* at 831, 96 S.Ct. at 1214. The guidelines governing command refusal of requests to distribute were in all relevant aspects identical to those in the case before us, *see id.* at 831, 96 S.Ct. 1211 n. 2.

We find *Greer* neither controlling nor persuasive with respect to the issue of the validity of the regulations implementing a system of prior restraint on petitions at the Iwakuni Air Station. Most significantly, of course, the holding in *Greer* was constitutionally based. The *Greer* Court had no occasion to consider the validity of that prior restraint regulation under § 1034 because petitions to Congress were not involved in *Greer.* The Court's statement that "nothing in the *Constitution*  .  .  . disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command," *id.* at 840, 96 S.Ct. at 1218 (emphasis added),[20] is therefore fully consistent with our conclusion that prior restraints on all petitioning activities at a base such as Iwakuni is violative of § 1034.

Moreover, even apart from the fact that the decision we now make is statutorily based, the above-quoted statement is consistent with our holding because, as earlier noted, commanders remain free to punish—and thus deter—petitioning activities which are unlawful or otherwise inconsistent with the military mission. We have held only that at a base such as Iwakuni commanders are not free to use a system of prior restraints to inhibit such activities; they remain free to do so in other ways.[21]

We also note that, even if we were to decide the issue before us on constitutional grounds, it is not clear that *Greer* would be controlling. Careful study of the regulation at issue in *Greer* leaves uncertain the question of whether or to what extent it in fact restricts petitioning activities. Although petitions could conceivably be encompassed within the term "other writings," it is not at all clear that solicitation of signatures is encompassed by the specific activities proscribed: "distribution" or "posting." In any event, the *Greer* regulation is obviously not directed at petitioning activities in the significant way that the regulations in this case are. The Supreme Court has previously enunciated the judgment that a statute should not be struck down as facially invalid simply because it potentially touches upon constitutionally protected activity at the margin. *Parker v. Levy, supra* 417 U.S. at 760, 94 S.Ct. 2547. Thus the Court's decision to uphold the regulation in *Greer* need not imply that the regulation would be constitutional if applied to petitioning activities.

Section 1034 is an exercise by Congress of its constitutional power "[t]o make Rules for the Government and Regulation of the land and naval Forces." U.S.Const. art. 1, § 8, cl. 14. In doing so Congress may, of

---

**20.** It may be that this statement is not even the basis for the holding of constitutional validity. In *Greer* those who sought to distribute materials were civilians, and the Court cited the "historically unquestioned power of [a] commanding officer summarily to exclude civilians from the area of his command" (*Cafeteria Workers v. McElroy,* 367 U.S. 886, 893, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)) in concluding that "respondents, therefore, had no generalized constitutional right to  .  .  . distribute leaf-

lets at Fort Dix." *Greer v. Spock,* 424 U.S. at 838, 96 S.Ct. at 1217.

**21.** Elsewhere in its opinion, the *Greer* Court was at pains to stress the particular need for discipline at a basic training camp such as Fort Dix. It may well be that this need is sufficient to allow a general system of prior restraints which would be unconstitutional at a base such as Iwakuni. *Cf.* note 15 *supra.*

course, elect to provide rights and privileges extending beyond those minimally guaranteed by the Constitution. Whatever the reach of that guarantee may be in a base of this kind, it is plainly evident that Congress in enacting § 1034 has been motivated by a purpose to strengthen, and not to limit, the first amendment rights of petition in the case of service personnel. It is, in any event, the statutory standard to which we look in determining the validity of the service regulations challenged in this case; and we find these regulations wanting insofar as they deal with petitioning activity directed to members of Congress.

We remand the case to the District Court with directions to revise its judgment in the manner indicated herein.

*It is so ordered.*

TAMM, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge McGowan's well-written and very careful opinion insofar as it vacates the portion of the district court's judgment that extends to materials unrelated to the petitioning process. However, because I am unable to agree with the conclusions and result he reaches concerning multi-signature petitions addressed to Congress by members of the armed forces, I must respectfully dissent from that part of his opinion.

I

By exercising an appropriate degree of judicial restraint, Judge McGowan has written a very narrow opinion based solely on statutory grounds. The result he reaches follows from two conclusions: first, that a petition, signed by more than one individual, addressed to a senator or representative by a member of the armed forces, is a protected communication under 10 U.S.C. § 1034 (1970); and second, assuming such a petition is protected, that regulations requiring prior approval of the petition by appropriate military authority are not necessary to the security of the United States. I disagree with both of these conclusions. Prior to commenting on them, however, a few preliminary remarks are in order.

We must not lose sight of the fact that this case arises from events that occurred in a purely military environment. Both the Congress and the Supreme Court have long recognized that "the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974); *see Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). For example, the Congress has made it a felony to urge or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the armed forces. *See* 18 U.S.C. §§ 2387–2388 (1970). Similarly, the Court has often indicated its awareness of the military's need for "a respect for duty and a discipline without counterpart in civilian life." *Schlesinger v. Councilman*, 420 U.S. 738, 757, 95 S.Ct. 1300, 1330, 43 L.Ed.2d 591 (1975); *see Greer v. Spock*, 424 U.S. 828, 848, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (Powell, J., concurring); *Burns v. Wilson*, 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality opinion). I mention these well-accepted propositions to illustrate my belief that legislative and judicial actions that seek to limit a military commander's disciplinary prerogatives should be only as intrusive as is necessary to accomplish the effect desired.

II

Consistent with the foregoing premise, I believe that laws affecting military discipline should be interpreted as narrowly as possible, because an expansive reading of such statutes may circumscribe the authority of military commanders to an extent never intended by Congress. In my opinion, the court's conclusion in this case that petitions are protected communications under 10 U.S.C. § 1034 clearly goes beyond what Congress intended when it passed that statute.

An objective reading of the legislative history demonstrates that the *sole* purpose in enacting 10 U.S.C. § 1034 was to ensure that an *individual* member of the military

could, at any time, write to his senators or representative without being required to have the communication proceed through command channels. The sponsor of the amendment, Congressman Byrnes of Wisconsin, introduced the measure because of an incident in which an *individual* sailor desired to communicate with Mr. Byrnes about a personal grievance and was "told by his commanding officer aboard ship that a direct communication with his Congressman was prohibited and it would make him subject to a court-martial." 97 Cong.Rec. 3776 (1951). As the majority notes, in a somewhat offhand fashion, *see* Majority opinion, *supra* at —— of —— U.S.App.D.C., at 912 of 575 F.2d n.16, when Mr. Byrnes was asked whether "the purpose [of the amendment was] 'to permit *any man* who is inducted to sit down and take a pencil and paper and write to *his* Congressman or Senator'," he replied, "That is right." 97 Cong. Rec. 3776 (emphasis added). Later, the chairman of the committee responsible for the legislation, Mr. Vinson of Georgia, reiterated that the amendment was intended "to let *every man* in the armed services have the privilege of writing *his* Congressman or Senator on any subject if it does not violate the law or if it does not deal with some secret matter." *Id.* at 3877 (emphasis added). If one construes the statute strictly, therefore, as it most certainly ought to be construed, it is apparent that individual communications with senators or representatives were indeed intended to be "the outer limit of the communication which Congress sought to protect in passing this legislation." *See* Majority opinion, *supra* at —— of 188 U.S.App.D.C., at 912 of 575 F.2d; *Carlson v. Schlesinger,* 167 U.S.App. D.C. 325, 511 F.2d 1327, 1333 (1975).[1]

The soundness of this conclusion is even more apparent when one considers a directly analogous statute, enacted almost forty years *before* 10 U.S.C. § 1034, which illus-

trates that Congress had no difficulty in employing unequivocal language when it did intend that multi-signature petitions be included within the protective ambit of a statute. Entitled "Right to *petition* Congress; employees," 5 U.S.C. § 7102 (1976) states (emphasis added): "The right of [civil service] employees, *individually or collectively, to petition Congress* or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." Section 1034, on the other hand, makes no mention of the key words "petition" or "collectively," and I hardly think that we should read into that statute something Congress clearly did not intend to be included.

The wisdom of Congress in not extending the protection afforded to petitions by civil service employees to petitions by members of the military is evident. The overt acts required to generate a petition, while only mildly disruptive to the tasks performed by civil service employees if done during off-duty hours, could be very harmful to military discipline and morale. In this case, appellees desired to canvass virtually every off-duty area of the base—including barracks, the base exchange, and the enlisted men's club[2]—in an effort to gain support for their petitions. I find it difficult to believe that Congress intended the narrow language of 10 U.S.C. § 1034 to afford blanket protection to these activities, since such protection necessarily strips the local commander of even the very limited right of prior review sought by the regulations under scrutiny here.

### III

Even assuming *arguendo* that multi-signature petitions are covered by 10 U.S.C. § 1034, I disagree with the conclusion that the regulations that provide for a system of

---

1. This construction of 10 U.S.C. § 1034 is entirely consistent with DOD Directive No. 1325.6 § III G (1969), Joint Appendix (J.A.) at 65–69. A petition can be signed either by one person or by many persons. The wording of the directive (emphasis added)—"*a member may pe-*

*tition* or present any grievance to any member of Congress . . ."—indicates that "petition" is being used in the singular sense in that document.

2. J.A. at 4; Record entry 17, at 5.

prior review of petitioning activities on the Iwakuni Air Station are not "necessary to the security of the United States." The linchpin of the majority's argument in favor of this conclusion is that the Iwakuni Air Station is "not in an actual and current combat zone,"[3] as was the case in *Carlson v. Schlesinger*. It also appears that the majority would have been more sympathetic to the regulations had they been applied at a "basic training camp," as in *Greer v. Spock*.[4] I find these distinctions to be untenable.

Our first President, who was intimately familiar with the horrors of armed conflict, once remarked that the most effective means of securing peace is to be prepared for war. This same theme was echoed by the Supreme Court in *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955) (emphasis added): "[I]t is the primary business of armies and navies to fight *or be ready to fight* wars should the occasion arise." The Congress, too, has recognized the inseparability of the military's responsibility both to wage and to be prepared to wage wars, by imposing similar sanctions on those who attempt to cause insubordination by members of the military whether during peacetime or during war. *Compare* 18 U.S.C. § 2387 (1970) *with id.* § 2388.

An affidavit submitted in the district court by a former commanding general at Iwakuni[5] indicates that the regulations under scrutiny in this case were promulgated with one goal in mind: to assist the local commander in accomplishing his assigned mission of having his command prepared to react immediately or on very short notice, a mission we have previously denominated as "a strong national interest." *Hess v. Schlesinger*, 159 U.S.App.D.C. 51, 486 F.2d 1311, 1312 (1973). I quote at length from this affidavit to illustrate how little difference there is between being stationed at Tan Son Nhut Air Base in Vietnam in 1971, as in *Carlson*, and being stationed at Iwakuni Air Station in Japan, either today, or in 1974 when the relevant actions commenced:

The First Marine Aircraft Wing, its personnel and equipment, is constantly maintained in a high degree of readiness for possible combat deployment on extremely short notice. For example, in early 1972, units of the First Marine Aircraft Wing stationed at Iwakuni, deployed to combat bases in Vietnam and Thailand within 24 hours of receiving notice. Later, during the spring of 1975, elements of the First Marine Aircraft Wing were rapidly deployed to assist in the evacuation of Phnom Penh and Saigon. At any time, the Wing may again be called upon to deploy under similar circumstances on a moment's notice. In this eventuality, the highest degree of loyalty, discipline, and morale will be necessary for the successful completion of the mission.

Personnel who are constantly prepared for deployment into combat or a crisis situation must at all times have the same strict discipline and high morale as would troops in actual combat situations. A well-trained and disciplined Marine, when considering the mission of the supporting units, must be prepared for instantaneous

---

**3.** Majority opinion at ―――― of 188 U.S.App. D.C., at 914 of 575 F.2d; *see* Memorandum opinion of May 21, 1976, J.A. at 83.

**4.** Majority opinion at ―――― of 188 U.S.App. D.C., at 915 of 575 F.2d n.21.

**5.** J.A. at 70–74. The district judge's characterization of this document as a "post hoc" rationalization, J.A. at 83 n.12, is very puzzling and somewhat troubling. At the time of the affidavit, the affiant had been in the Marine Corps for 35 years, had commanded Iwakuni Air Station for over a year just two years before, and was serving as Chief of Staff of the Marine Corps. It is hard to imagine anyone more

qualified to set forth matters of significant value to the trier of fact, and yet it is obvious that the affidavit was accorded little, if any, weight by the judge below. The case cited in support of this approach, *Hess v. Schlesinger*, 159 U.S. App.D.C. 51, 486 F.2d 1311 (1973), is hardly apposite. Indeed, the affidavits in *Hess* were found to be insufficient to support a summary judgment precisely because military *lawyers* rather than military *commanders* were making judgments concerning the efficiency of units at Iwakuni in certain deployment scenarios. That deficiency is not present in the instant case.

deployment for such contingency operations, ranging from protection/evacuation to combat operations. The highest standards of mental, physical, moral discipline, and morale of all members of the Command are central to combat readiness and effectiveness. . . . These traits must be inherent in each Marine before he goes into combat and not a learning process reserved for the actual battlefield. Individual or collective efforts by those who would attempt, consciously or otherwise, to undermine good order, discipline, loyalty, and morale, cannot be tolerated. Therefore, the regulations under challenge in this lawsuit, which afford a Commander the ability and authorization to screen such printed material prior to its distribution, are in keeping with the requirement for the safety and well-being of his troops.[6]

These comments, and those previously cited sentiments of support from all three branches of government, convince me that those regulations establishing a system of prior review of petitioning activities at Iwakuni most certainly are "necessary to the security of the United States." Only the local commander has the ability and expertise necessary to assess the effect of such activities on the combat readiness of his

command, see *Schneider v. Laird*, 453 F.2d 345, 347 (9th Cir. 1972) (per curiam); *Yahr v. Resor*, 431 F.2d 690, 691 (4th Cir. 1970) (per curiam), and thus a *limited* right of prior review should be left to him. I stress the word "limited," for, as noted by the majority, the Government has conceded that the military authorities acted improperly in denying the requests in issue here. Thus, in future cases, only those very few petitioning activities that are beyond this rather high threshold would be subject to circumscription.[7] Rather than totally usurping the local commander's authority in this regard, as the majority opinion has done,[8] I would prefer to repose confidence in the commander to review petitions in a reasonable and fair manner; this proposition is simply a corollary to that which expresses confidence in him to do his part in securing our Nation.

## IV

In summary, I would hold that multi-signature petitions are not protected communications under 10 U.S.C. § 1034, and, alternatively, that the regulations in issue here are proper because they are necessary to the security of the United States. In so holding, we would properly honor "the sound

---

6. J.A. at 73–74.

7. I believe that DOD Directive No. 1325.6, *supra* note 1, and regulations promulgated thereunder, J.A. at 51, 54, 58 & 61–62, furnish the proper standard to be employed by the local commander:

> It is the mission of the Department of Defense to safeguard the security of the United States. *The service member's right of expression should be preserved to the maximum extent possible, consistent with good order and discipline and the national security.* On the other hand, no Commander should be indifferent to conduct which, if allowed to proceed unchecked, would destroy the effectiveness of his unit. The proper balancing of these interests will depend largely upon the calm and prudent judgment of the responsible Commander.

J.A. at 65 (emphasis added). *See also id.* at 52; Majority opinion at ——–—— of 188 U.S. App.D.C., at 913–914 of 575 F.2d & n.18.

The presumption *against* prohibition of petitioning activities in made even stronger by provisions of the implementing regulations that require a commander who prohibits such activities to report this fact immediately to his superior officers. *See* J.A. at 60, 63. *See also id.* at 64. Since any of these superiors has the authority to reverse the commander's prohibition decision, there thus exists a further safeguard against arbitrary application of the regulations. *See Greer v. Spock*, 424 U.S. 828, 831–32 n.2, 840, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

8. The suggestion by the majority that post hoc legal action leaves the commander with a means to deter petitioning activities that are unlawful or otherwise inconsistent with the military mission is unpersuasive. Majority opinion at ——, ——, ——–—— of 188 U.S. App.D.C., at 912, 914, 915 of 575 F.2d. If a petitioning activity is indeed punishable, the harm to the unit's mission will have been done before legal proceedings can be instituted, and long before the proceedings are completed. Given the quick-reaction nature of the Iwakuni mission, a legal recourse alternative is of little practical value to the commander.

and established principle that it is not the business of the courts to run the military." *Vander-Molen v. Stetson*, 187 U.S.App.D.C. 183, 195, 571 F.2d 617, 629 (1977) (Robb, J., dissenting). I respectfully dissent.