Wayne M. ALLEN et al., Appellees,

v.

A. J. MONGER et al., Appellants.

George T. MOSES et al., Appellees,

v.

S. R. FOLEY, Jr., et al., Appellants.

No. 76–1125.

United States Court of Appeals,
Ninth Circuit.

Oct. 4, 1978.

John F. Cordes, Jr. (argued), Dept. of Justice, Washington, D. C., for appellants.

Joseph Remcho (argued), Rosen, Remcho & Henderson, San Francisco, Cal., for appellees.

Before GOODWIN and HUG, Circuit Judges and PALMIERI,* District Judge.

GOODWIN, Circuit Judge:

The government appeals a decree enjoining enforcement by the Navy of regulations restricting sailors in the circulation of petitions addressed to members of Congress. We affirm.

In the spring of 1973 some crew members on two aircraft carriers stationed in Alameda, California, prepared petitions to various members of Congress, objecting to planned movements of their ships. Certain enlisted men of the U.S.S. Hancock objected to an-

* The Honorable Edmund L. Palmieri, United States District Judge for the Southern District of New York, sitting by designation.

other West Pacific cruise. Some crew members of the U.S.S. Midway opposed its intended homeporting in Japan.

The Hancock protesters had their petition[1] printed off the base, and requested Captain (now Admiral) Monger, the Hancock's commanding officer, to authorize its distribution. Captain Monger denied permission, citing U.S.S. Hancock Instruction 1620.4A, which was based on Naval Instruction 1620.1. These instructions require prior approval for the distribution of printed materials. The commander may deny permission if the materials present "a clear danger to the loyalty, discipline, or morale of military personnel" or if the distribution "would materially interfere with the accomplishment of a military mission." Captain Monger said that circulating the petition might upset the morale and discipline of a green crew preparing for a new cruise.

One protester distributed the petition despite Captain Monger's action, and was subsequently punished at a Captain's Mast. Other sailors were deterred from circulating the petition.

Certain crew members on the Midway also sought to circulate a petition to members of Congress opposing a proposed change in home ports.[2] Like the Hancock petition, the Midway petition did not suggest that anyone should disobey an order or otherwise refuse to do his duty. This petition was also printed off base at no expense to the government. The petitioners requested Captain (now Admiral) Foley, the Midway's commander, to permit circulation of the petition, and he refused. He later refused to permit circulation of a slightly modified petition. He based his refusal upon Midway Instruction 1620.6, which was also derived from Naval Instruction 1620.1. Because of Captain Foley's decision, the Midway petitioners did not circulate the petition on board ship.

Both the Hancock and the Midway protesters filed actions in district court, alleging that the restrictions on petitioning were unconstitutional abridgments of their First Amendment rights and that they violated 10 U.S.C. § 1034.

The district court consolidated the cases. The court then held the cases in abeyance pending naval administrative-review process. After at least one sailor from each ship lost his administrative appeal, the district court certified the actions as class actions.

The district court held that the regulations would have a chilling effect on the exercise of First Amendment rights, and held them to be invalid as applied and overbroad. The court also held that the regulations violated § 1034. The court enjoined enforcement, but provided the Navy leave to promulgate new regulations that would limit the time, place, and manner of petitioning to avoid interference with the ships' functioning. *Allen v. Monger*, 404 F.Supp. 1081 (N.D.Cal.1975). The government ap-

---

1. The Hancock petition said:

"Dear Congressman Stark,
We, the undersigned crew members of the U.S.S. HANCOCK, in recognition of the fact that the United States is officially no longer at war with the countries of Indo-China, and because the HANCOCK has already been in commission for 29 years, respectfully request that you ask Congress to investigate the necessity of having the HANCOCK make another West Pacific cruise."

2. The Midway petition said:

"We, the crew and families of the U.S.S. Midway, do hereby exercise our rights as citizens of the United States of America to petition Congress on the following issue. We object to the homeporting in Yokosuka, Japan of the U.S.S. Midway for the following reasons:

"(1) We are freely opposed to the excessive expansion and imposition of United States military forces overseas. Homeporting the Midway in Yokosuka is another attempt by the U.S. to permanently establish its military presence in Asia.
"(2) We object to the false statements made by the military that there is an *all volunteer* crew to deploy to Yokosuka.
"(3) We disapprove of the government's lack of preparations in providing housing and other living accommodations to support our full complement of crew and families.
"(4) It is the right of all military personnel as citizen-soldiers of the U.S. to practice individually or collectively their rights as citizens, namely, (a) the right to free speech, (b) the right to peacefully assemble, (c) freedom of the press, and (d) the right to petition Congress."

peal challenges the decrees in several respects.

## I. MOOTNESS

A preliminary issue is whether the case is moot. The district court found jurisdiction under 28 U.S.C. § 1331. We have applied § 1331, as it stands after the 1976 amendment deleting the $10,000 jurisdictional amount, to a case filed before the amendment passed. *Stickelman v. United States*, 563 F.2d 413, 415 n.2 (9th Cir. 1977). Subject-matter jurisdiction under § 1331 has been satisfied.

■ The Hancock is no longer in service, and most, if not all, of the petitioners have since been discharged. The government therefore suggests that these cases are moot. Similar regulations, however, remain in effect throughout the Navy. No one now seeks to circulate the Hancock or Midway petitions. It is unlikely that any similar petition could keep the issue alive long enough for a case to reach this court on appeal. Military enlistments are for a few years at a time. Any particular plaintiff probably would complete an enlistment before he or she could complete the judicial process. Yet the regulations raise serious questions that deserve judicial review. These regulations and the resulting issues are clearly "capable of repetition, yet evading review," and therefore are not moot. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911), *quoted in Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

## II. PROTECTION FOR PETITIONING

On appeal, the petitioners again urge their constitutional arguments. However, because the district court's decision may be upheld on purely statutory grounds, we have no occasion to reach the constitutional issue.

Title 10 U.S.C. § 1034 provides:

"No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States."

We must decide, first, whether § 1034 applies to concerted activities such as petitions, and, second, whether the regulations which prohibited the circulation of the petition are "necessary to the security of the United States."

The District of Columbia Circuit recently considered both questions and held that § 1034 covers petitioning and that these regulations are not necessary to the national security. *Huff v. Secretary of the Navy*, 188 U.S.App.D.C. 26, 575 F.2d 907 (1978). We agree.

Section 1034 prohibits restrictions on communications with Congress; it does not by its terms distinguish among different kinds of communications. Congress would no doubt consider a signed petition addressed to members of Congress to be communication with it.

Some military personnel might find it easier to communicate by signing a petition than by writing a letter. Others might believe that one petition signed by many voters would have more impact than scattered individual letters. While the statute speaks of "any member", we do not think its use of the singular is controlling. A literal reading would deny protection even to a letter if two people drafted and signed it. We prefer to read the statute in light of the traditional ways Americans communicate with their legislators; petitioning is traditional.

Congressman John W. Byrnes of Wisconsin first introduced the issue in the debates on the Universal Military Service and Training Act of 1951, Pub.L. 82–51, 65 Stat. 75 (1951). He did so because of the difficulty one of his constituents in the Navy asserted in writing him about an individual problem. The colloquy between Congressman Byrnes and Congressman Vinson, chairman of the House Armed Services Committee, primarily inquired into the current regulations to determine their effect upon communications concerning individual grievances. As originally adopted, the amendment prohibited drafting anyone into

a branch of the armed forces that limited the rights of its members to communicate directly with members of Congress. 97 Cong.Rec. 3775–76 (April 12, 1951).

Since Congressman Byrnes' original amendment was to a proposed substitute to the pending bill, it lapsed when the substitute was defeated. Congressman Vinson wrote a different version, which Congressman Byrnes approved and eventually introduced the next day. This version is the one Congress adopted, and, with minor amendments made in 1956, it is the source of § 1034.[3] Under this proposal, no member of the armed forces could be restricted from communicating "directly or indirectly" with any member or members of Congress "concerning any subject" unless the communication violated a law or a regulation necessary to the security and safety of the United States. 97 Cong.Rec. 3877, 3883 (April 13, 1951). While Congressman Vinson again described the statute as one letting any man write his congressman, the language indicated a broader purpose. It did not simply cover all branches instead of just those taking draftees; it also changed the nature of the right given.

Congressman Byrnes' original concern was with military persons facing individual hardships who wanted their congressman's help. His emphasis was on Navy regulations which seemed to limit direct communication on personal problems. The Congressman did not then object to Army regulations which severely restricted communications on general legislative matters. Letters of the Secretary of the Navy and of the Secretary of the Army to Congressman Byrnes, in 97 Cong.Rec. 3776 (April 12, 1951).

The Vinson modification, however, prohibited restrictions on communications "on any subject". This modification was made a day or two after President Truman's dismissal of General MacArthur, in part for his communicating with Congress outside regular channels, and about a week before the general addressed a joint session of Congress.[4] In this light, it seems clear that Congress was willing to break with traditional notions of military discipline in order to assure that Congress would receive communications reflecting a variety of military sentiment on important issues. In this change, Congress went well beyond Congressman Byrnes' original focus on individual grievances.

The Vinson proposal also allowed communicating "directly or indirectly" with members of Congress. This phrase may have been inspired by General MacArthur's use of press conferences, but it may also have been intended to cover enlisted persons who simply chose to sign petitions. Petitioners communicate with Congress, but they do so indirectly, by showing their approval of language someone else has written rather than by writing their own language. Congress deleted the "directly or indirectly" phrase, along with "concerning any subject", in 1956 when it adopted current § 1034. The codifiers note, correctly, we believe, that the language was surplusage. The 1956 changes, therefore, did not change the statute's meaning. 10 U.S.C. § 1034, explanatory note.

The 1956 amendment also changed "member or members of Congress" to "member of Congress"; again, the change was to eliminate surplusage. This treatment of the plural encourages us to give less weight to the singular "any member of an armed force" in § 1034. Congress clearly intended to protect communication with several members of Congress at a time, even though it used the singular; while the record is not so clear, it is unlikely that Congress intended to restrict protected

---

3. Act of June 19, 1951, Pub.L.No. 82–51, § 1(d) (last paragraph), 65 Stat. 78.

4. Congressmen debated the bill with MacArthur's dismissal in mind. The issue immediately before Congressman Byrnes introduced the final version was a proposed amendment to give the commander·in the field all power to decide what supply facilities, troop concentrations, and other targets to bomb. MacArthur's objections to the restraints President Truman placed on him in these regards were, of course, a major issue in his removal. 97 Cong.Rec. 3883 (April 13, 1951).

communication by more than one member of the armed forces at a time.

■ We therefore hold that § 1034 protects petitioning. The importance petitioning Congress has played in our history, combined with a legislative history that shows Congress concerned to keep communications open despite threats to discipline and a history of verbal changes in the statute that encourages a broad interpretation of its protections, all lead to this conclusion. The right to petition, of course, includes a reasonable opportunity to solicit signatures for the petition.

### III. PRIOR RESTRAINTS

■ Naval Instruction 1620.1 and the related instructions on the Hancock and the Midway establish a system of prior restraint on petitions to Congress. They do not distinguish between ships at port in home waters and ships actively engaged in combat in a combat zone. Under § 1034 these regulations are valid only if they are "necessary to the security of the United States". *Huff v. Secretary of the Navy*, 188 U.S.App.D.C. at 33, 575 F.2d at 914. As did the District of Columbia Circuit in *Huff*, we hold that the Navy has failed to show that the national security required a system of prior restraints in these cases.

Both commanding officers apparently thought that circulation of the petitions might affect the discipline and morale of their commands. The actual circulation on the Hancock had produced some resentment among nonpetitioning sailors.[5] The district court took the view that time, place, and manner regulations could insure that petitioning would not disrupt the ships' orderly operations. The Uniform Code of Military Justice under certain circumstances enables the Navy to punish a crew member whose petition is truly disruptive. These petitions,

while they were disagreeable to the Navy, did not threaten the national security.

[4] The standard of protection under § 1034 is high. Congress in adopting it consciously chose to give communication with Congress preference over the preferences of military commanders. Prior restraints are suspect in the constitutional context. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). They stand no better in a statutory setting. Well publicized petitions may inconvenience the military. Some petitions may even produce division and morale problems, but we cannot say that there is no less restrictive method than total prior restraint to protect the national security. Since the regulations are overbroad and exceed the needs of the national security, we affirm the district court.

*Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), which the government emphasizes, does not apply to this case. *Greer* rejected the First Amendment claims of uninvited civilians on a military reservation. The present case deals with military personnel claiming rights under a statute enacted for their benefit.

Affirmed.

---

5. No commanding officer relishes the prospect of having a well-trained and dedicated military unit branded as "crybabies" by the patrons of service clubs, messes, and waterfront taverns. The damage to morale and the nuisance of resulting disorders cannot be ignored. The prospect of these dysfunctional results from the exercise of the rights protected by the statute apparently did not weigh as heavily upon the members of Congress as did the desire to keep communications open.