BROWN, SECRETARY OF DEFENSE, ET AL. *v.* GLINES

No. 78–1006.   Argued November 6, 1979—Decided January 21, 1980

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., WHITE, BLACKMUN, and REHNQUIST, JJ., joined.   BRENNAN, J., filed a

dissenting opinion, *post*, p. 361. STEWART, J., filed a dissenting opinion in which BRENNAN, J., joined, *post*, p. 374. STEVENS, J., filed a dissenting opinion, *post*, p. 378. MARSHALL, J., took no part in the consideration or decision of the case.

*Kent L. Jones* argued the cause *pro hac vice* for petitioners. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock,* and *Robert E. Kopp.*

*David M. Cobin,* by appointment of the Court, 441 U. S. 930, argued the cause for respondent. With him on the brief was *Melvin K. Dayley.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case involves challenges to United States Air Force regulations that require members of the service to obtain approval from their commanders before circulating petitions on Air Force bases. The first question is whether the regulations violate the First Amendment. The second question is whether prohibiting the unauthorized circulation of petitions to Members of Congress violates 10 U. S. C. § 1034, which proscribes unwarranted restrictions on a serviceman's right to communicate with a Member of Congress.

## I

The Air Force regulations recognize that Air Force personnel have the right to petition Members of Congress and other public officials. Air Force Reg. 30–1 (9) (1971). The regulations, however, prohibit "any person within an Air Force facility" and "any ·[Air Force] member . . . in uniform or . . . in a foreign country" from soliciting signatures on a petition without first obtaining authorization from the appropriate commander. *Ibid.*[1] They also provide that "[n]o member

---

[1] Air Force Reg. 30–1 (9) (1971) provides:

"Right of Petition. Members of the Air Force, their dependents and civilian employees have the right, in common with all other citizens, to petition the President, the Congress or other public officials. However,

of the Air Force will distribute or post any printed or written material . . . within any Air Force installation without permission of the commander. . . ." Air Force Reg. 35–15 (3) (a)(1) (1970). The commander can deny permission only if he determines that distribution of the material would result in "a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of a military mission. . . ." *Id.*, 35–15 (3)(a)(2).[2]

---

the public solicitation or collection of signatures on a petition by any person within an Air Force facility or by a member when in uniform or when in a foreign country is prohibited unless first authorized by the commander." This regulation has been superseded by Air Force Reg. 30–1 (19)(b) (1977), which contains substantially the same provisions.

[2] Air Force Reg. 35–15 (3)(a) (1970) provides:

"(1) No member of the Air Force will distribute or post any printed or written material other than publications of an official governmental agency or base regulated activity within any Air Force installation without permission of the commander or his designee. A copy of the material with a proposed plan or method of distribution or posting will be submitted when permission is requested. Distribution of publications and other materials through the United States mail or through official outlets, such as military libraries and exchanges, may not be prohibited under this regulation.

"(2) When prior approval for distribution or posting is required, the commander will determine if a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of a military mission, would result. If such a determination is made, distribution or posting will be prohibited and HQ USAF (SAFOI) will be notified of the circumstances.

"(3) Mere possession of materials unauthorized for distribution or posting may not be prohibited unless otherwise unlawful. However, such material may be impounded if a member of the Armed Forces distributes or posts or attempts to distribute or post such material within the installation. Impounded materials will be returned to the owner when departing the installation unless determined to be evidence of a crime.

"(4) Distribution or posting may not be prohibited solely on the ground that the material is critical of Government policies or officials.

"(5) In general, installation commanders should encourage and promote

Albert Glines was a captain in the Air Force Reserves. While on active duty at the Travis Air Force Base in California, he drafted petitions to several Members of Congress and to the Secretary of Defense complaining about the Air Force's grooming standards.[3] Aware that he needed command approval in order to solicit signatures within a base, Glines at first circulated the petitions outside his base. During a routine training flight through the Anderson Air Force Base in Guam, however, Glines gave the petitions to an Air Force sergeant without seeking approval from the base commander. The sergeant gathered eight signatures before military authorities halted the unauthorized distribution. Glines' commander promptly removed him from active duty, determined that he had failed to meet the professional standards expected of an officer, and reassigned him to the standby reserves. Glines then brought suit in the United States District Court for the Northern District of California claiming that the Air Force regulations requiring prior approval for the circulation of petitions violated the First Amendment and 10 U. S. C. § 1034.[4] The court granted Glines' motion for

---

the availability to service personnel of books, periodicals, and other media which present a wide range of viewpoints on public issues."

[3] The petition to the Secretary of Defense, for example, read:

"Dear Secretary of Defense:

"We, the undersigned, all American citizens serving in the Armed Services of our nation, request your assistance in changing the grooming standards of the United States Air Force.

"We feel that the present regulations on grooming have caused more racial tension, decrease in morale and retention, and loss of respect for authorities than any other official Air Force policy.

"We are similarly petitioning Senator Cranston, Senator Tunney, Senator Jackson, and Congressman Moss in the hope that one of our elected or appointed officials will help correct this problem." *Glines* v. *Wade*, 586 F. 2d 675, 677, n. 1 (CA9 1978).

[4] Glines named as defendants three of his superior officers, the Secretary of the Air Force, and the Secretary of Defense.

summary judgment and declared the regulations facially invalid. *Glines* v. *Wade,* 401 F. Supp. 127 (1975).[5]

The Court of Appeals for the Ninth Circuit affirmed the finding of facial invalidity. *Glines* v. *Wade,* 586 F. 2d 675 (1978).[6] Following its decision in an earlier case involving collective petitions to Members of Congress, the court first determined that the regulations violated 10 U. S. C. § 1034.[7] The statute prohibits any person from restricting a serviceman's communication with Congress "unless the communication is unlawful or violates a regulation necessary to the security of the United States." The Air Force regulations against unauthorized petitioning on any base did not satisfy the statutory standard, the court concluded, because the Government had not shown that such restraints on servicemen in Guam were necessary to the national security. 586 F. 2d, at 679. Since § 1034 did not cover Glines' petition to the Secretary of Defense, the court next considered whether the regulations violated the First Amendment. The court acknowledged that requirements of military discipline could justify otherwise impermissible restrictions on speech. It held, however, that

---

[5] The District Court also awarded Glines backpay and ordered him restored to active service. 401 F. Supp., at 132. The Court of Appeals affirmed the reinstatement order, but it vacated the backpay award on the ground that all monetary claims against the United States for more than $10,000 are within the exclusive jurisdiction of the Court of Claims. 586 F. 2d, at 681–682. Neither issue is before this Court.

[6] The Court of Appeals held that Glines was not required to exhaust his administrative remedies by seeking relief from the Air Force Board for the Correction of Military Records. The court found that Glines' claim involved statutory and constitutional matters over which the Board had no jurisdiction. *Id.,* at 678. Since the petitioners expressly declined to raise the exhaustion issue in this Court, Pet. for Cert. 6, n. 2, error in the Court of Appeals' resolution of the issue would not affect our jurisdiction. Cf. *Mathews* v. *Eldridge,* 424 U. S. 319, 330 (1976).

[7] The Court of Appeals' decision and the discussion of this issue appear in its opinion in *Allen* v. *Monger,* 583 F. 2d 438, 440–442 (1978), cert. pending *sub nom. Brown* v. *Allen,* No. 78–1005.

the Air Force regulations are unconstitutionally overbroad because they might allow commanders to suppress "virtually all controversial written material." 586 F. 2d, at 681. Such restrictions the court concluded, "exceed anything essential to the government's interests." *Ibid.* We granted certiorari, 440 U. S. 957 (1979), and we now reverse.

## II

In *Greer* v. *Spock,* 424 U. S. 828, 840 (1976), MR. JUSTICE STEWART wrote for the Court that "nothing in the Constitution . . . disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command." In that case, civilians who wished to distribute political literature on a military base challenged an Army regulation substantially identical to the Air Force regulations now at issue. See *id.,* at 831, and n. 2. The civilians claimed that the Army regulation was an unconstitutional prior restraint on speech, invalid on its face. We disagreed. We recognized that a base commander may prevent the circulation of material that he determines to be a clear threat to the readiness of his troops. See *id.,* at 837–839. We therefore sustained the Army regulation. *Id.,* at 840.[8] For the same reasons, we now uphold the Air Force regulations.[9]

---

[8] We specifically emphasized that the Army regulation at issue in *Greer* v. *Spock* did "not authorize the [base] authorities to prohibit the distribution of conventional political campaign literature." 424 U. S., at 831, n. 2, 840. Thus, our decision to sustain that regulation was distinct from our concomitant decision to uphold another regulation that prevented civilians from using a military base as a forum for the expression of political views, *id.,* at 838–839. See *id.,* at 841 (BURGER, C. J., concurring); *id.,* at 848–849 (POWELL, J., concurring).

[9] MR. JUSTICE STEVENS' dissenting opinion seems to suggest that we should avoid the constitutional issue in this case by applying 10 U. S. C. § 1034 to petitioning activity that the statute otherwise would not protect. *Post,* at 378. Since Glines' petition to the Secretary of Defense was not covered by the statute, however, we agree with the Court of

354

These regulations, like the Army regulation in *Spock,* protect a substantial Government interest unrelated to the suppression of free expression. See *Procunier* v. *Martinez,* 416 U. S. 396, 413 (1974). The military is, "by necessity, a specialized society separate from civilian society." *Parker* v. *Levy,* 417 U. S. 733, 743 (1974). Military personnel must be ready to perform their duty whenever the occasion arises. *Ibid.* To ensure that they always are capable of performing their mission promptly and reliably, the military services "must insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger* v. *Councilman,* 420 U. S. 738, 757 (1975); see *Department of Air Force* v. *Rose,* 425 U. S. 352, 367–368 (1976).

" 'Speech that is protected in the civil population may . . . undermine the effectiveness of response to command.' " *Parker* v. *Levy, supra,* at 759, quoting *United States* v. *Priest,* 21 U. S. C. M. A. 564, 570, 45 C. M. R. 338, 344 (1972). Thus, while members of the military services are entitled to the protections of the First Amendment, "the different character of the military community and of the military mission requires a different application of those protections." *Parker* v. *Levy,* 417 U. S., at 758. The rights of military men must yield somewhat " 'to meet certain overriding demands of discipline and duty. . . .' " *Id.,* at 744, quoting *Burns* v. *Wilson,* 346 U. S. 137, 140 (1953) (plurality opinion).[10] Speech likely to interfere with these vital prerequisites for military effectiveness therefore can be excluded from a military base. *Spock,*

Appeals that "[t]his petition requires us to decide whether the First Amendment also protects Glines' activities." 586 F. 2d, at 679. As the Court of Appeals understood, Glines' petition to the Secretary was itself a sufficient reason for his reassignment to the standby reserves.

[10] See Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 935–936 (1936); Terrell, Petitioning Activities on Military Bases: The First Amendment Battle Rages Again, 28 Emory L. J. 3, 5–14 (1979).

424 U. S., at 840; *id.,* at 841 (BURGER, C. J., concurring); *id.,* at 848 (POWELL, J., concurring).

Like the Army regulation that we upheld in *Spock,* the Air Force regulations restrict speech no more than is reasonably necessary to protect the substantial governmental interest. See *Procunier* v. *Martinez, supra.* Both the Army and the Air Force regulations implement the policy set forth in Department of Defense (DOD) Directive 1325.6 (1969).[11] That directive advises commanders to preserve servicemen's "right of expression . . . to the maximum extent possible, consistent with good order and discipline and the national security." *Id.,* ¶ II. Thus, the regulations in both services prevent commanders from interfering with the circulation of any materials other than those posing a clear danger to military loyalty, discipline, or morale. Air Force Reg. 35–15 (3) (a)(2) (1970); Army Reg. 210–10, ¶ 5–5 (c) (1970); see DOD Dir. 1325.6, ¶ III (A)(1) (1969). Indeed, the Air Force regulations specifically prevent commanders from halting the distribution of materials that merely criticize the Government or its policies. Air Force Reg. 35–15 (3)(a)(4) (1970); see DOD Dir. 1325.6, ¶ III (A)(3) (1969). Under the regulations, Air Force commanders have no authority whatever to prohibit the distribution of magazines and newspapers through regular outlets such as the post exchange newsstands. Air Force Reg. 35–15 (3)(a)(1) (1970); see DOD Dir. 1325.6, ¶ III (A)(1) (1969).[12] Nor may they interfere with the "[d]istribution of publications and other materials through

---

[11] The Navy regulations adopted pursuant to DOD Dir. 1325.6 are at issue in *Secretary of Navy* v. *Huff, post,* p. 453, which we also decide today.

[12] The Army regulations allowed a commander to delay, and the Department of the Army to prevent, the distribution within a military base of particular issues of a commercial publication. Army Reg. 210–10, ¶¶ 5–5 (c), (d) (1970). That part of the Army regulations was not at issue in *Greer* v. *Spock.* See 424 U. S., at 832, n. 2. The Air Force regulations contain no such provision.

the United States mail. . . ." Air Force Reg. 35–15 (3)(a)(1) (1970). The Air Force regulations also require any commander who prevents the circulation of materials within his base to notify his superiors of that decision. Air Force Reg. 35–15 (3)(a)(2) (1970); see Army Reg. 210–10, ¶ 5–5 (d) (1970). *Spock* held that such limited restrictions on speech within a military base do not violate the First Amendment. 424 U. S., at 840; *id.*, at 848 (POWELL, J., concurring).

*Spock* also established that a regulation requiring members of the military services to secure command approval before circulating written materials within a military base is not invalid on its face. *Id.*, at 840.[13] Without the opportunity to review materials before they are dispersed throughout his base, a military commander could not avert possible disruptions among his troops. Since a commander is charged with maintaining morale, discipline, and readiness, he must have authority over the distribution of materials that could affect adversely these essential attributes of an effective military force.[14] "[T]he accuracy and effect of a superior's command

---

[13] Glines would distinguish *Spock* on the ground that the plaintiffs in that case were civilians who had no specific right to enter a military base. The distinction is unpersuasive. Our decision in *Spock* rejected a facial challenge to a regulation that required "any person," civilian or military, to obtain prior permission for the distribution of literature within a base. *Id.*, at 831. Unauthorized distributions of literature by military personnel are just as likely to undermine discipline and morale as similar distributions by civilians. Furthermore, the military has greater authority over a serviceman than over a civilian. See *Parker* v. *Levy*, 417 U. S. 733, 749–751 (1974). Even when not confronted with the special requirements of the military, we have held that a governmental employer may subject its employees to such special restrictions on free expression as are reasonably necessary to promote effective government. See *CSC* v. *Letter Carriers*, 413 U. S. 548, 565 (1973); *Cole* v. *Richardson*, 405 U. S. 676, 684 (1972); cf. *Kelley* v. *Johnson*, 425 U. S. 238, 245–248 (1976).

[14] The special dangers present in certain military situations may warrant different restrictions on the rights of servicemen. But those restrictions necessary for the inculcation and maintenance of basic discipline and pre-

depends critically upon the specific and customary reliability of [his] subordinates, just as the instinctive obedience of subordinates depends upon the unquestioned specific and customary reliability of the superior." *Department of Air Force v. Rose,* 425 U. S., at 368. Because the right to command and the duty to obey ordinarily must go unquestioned, this Court long ago recognized that the military must possess substantial discretion over its internal discipline. See, *e. g.,* *Schlesinger* v. *Councilman,* 420 U. S. 738 (1975); *Parker* v. *Levy,* 417 U. S. 733 (1974); *Burns* v. *Wilson,* 346 U. S. 137 (1953); *Orloff* v. *Willoughby,* 345 U. S. 83 (1953); *In re Grimley,* 137 U. S. 147 (1890). In *Spock,* we found no facial constitutional infirmity in regulations that allow a commander to determine before distribution whether particular materials pose a clear danger to the good order of his troops.[15]

---

paredness are as justified on a regular base in the United States, *Schneider* v. *Laird,* 453 F. 2d 345 (CA10) (*per curiam*), cert. denied, 407 U. S. 914 (1972); *Dash* v. *Commanding General,* 307 F. Supp. 849 (SC 1969), aff'd, 429 F. 2d 427 (CA4 1970) (*per curiam*), cert. denied, 401 U. S. 981 (1971), as on a training base, *Greer* v. *Spock, supra,* or a combat-ready installation in the Pacific, *Carlson* v. *Schlesinger,* 167 U. S. App. D. C. 325, 511 F. 2d 1327 (1975). Loyalty, morale, and discipline are essential attributes of all military service. Combat service obviously requires them. And members of the Armed Services, wherever they are assigned, may be transferred to combat duty or called to deal with civil disorder or natural disaster. Since the prior approval requirement supports commanders' authority to maintain basic discipline required at nearly every military installation, it does not offend the First Amendment. "This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there [are] a substantial number of situations to which it might be validly applied." *Parker* v. *Levy, supra,* at 760.

[15] Commanders sometimes may apply these regulations "irrationally, invidiously, or arbitrarily," thus giving rise to legitimate claims under the First Amendment. *Greer* v. *Spock, supra,* at 840; see *Secretary of Navy* v. *Huff, post,* at 457–458, n. 5. But Glines, who—like the civilians in *Spock*—never requested permission to circulate his materials, has not and cannot raise such a claim. *Greer* v. *Spock,* 424 U. S., at 840; *id.,* at 849 (POWELL, J., concurring).

The Air Force regulations at issue here are identical in purpose and effect to the regulation that we upheld in *Spock*. We therefore conclude that they do not violate the First Amendment.

## III

The only novel question in this case is whether 10 U. S. C. § 1034 bars military regulations that require prior command approval for the circulation within a military base of petitions to Members of Congress. The statute says that "[n]o person may restrict *any member* of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States." (Emphasis added.) Glines contends that this law protects the circulation of his collective petitions as well as the forwarding of individual communications. We find his contention unpersuasive.

Section 1034 was introduced as a floor amendment to the Universal Military Training and Service Act of 1951 in response to a specific and limited problem. While Congress was debating the Act, Congressman Byrnes of Wisconsin learned that a young constituent seeking a hardship discharge from the Navy "had been told by his commanding officer . . . that a direct communication with his Congressman was prohibited and [that] it would make him subject to court-martial." 97 Cong. Rec. 3776 (1951). When the Congressman made inquiry about the regulations imposing this restriction, the Secretary of the Navy informed him that they required "any letter from a member of the naval service . . . to a Congressman which affects the Naval Establishment . . . [to] be sent through official channels." *Ibid.*[16] The Con-

---

[16] The relevant Navy regulation actually imposed restrictions on "[a]ll petitions, remonstrances, memorials and communications of any person or persons in the naval service. . . ." Navy Regs., art. 1248 (1948). Glines argues that Congress intended to remove all restrictions imposed by the regulation, including those on collective as well as individual petition-

gressman then proposed an amendment to the pending military legislation that would outlaw this requirement.

Congressman Byrnes' purpose was "to permit any man who is inducted to sit down and take a pencil and paper and write to his Congressman or Senator." *Ibid.*[17] The entire legislative history of the measure focuses on providing an avenue for the communication of individual grievances. The Chairman of the Armed Services Committee succinctly summarized the legislative understanding. The amendment, he said, was intended "to let every man in the armed services have the privilege of writing his Congressman or Senator on any subject if it does not violate the law or if it does not deal with some secret matter." *Id.*, at 3877. It therefore is clear that Congress enacted § 1034 to ensure that an individual member of the Armed Services could write to his elected representatives without sending his communication through official channels.[18]

---

ing. But the plain language of § 1034 reflects no such intention. Indeed, nothing in the legislative history suggests that Congress even was aware of the full scope of the Navy regulation.

[17] The original proposal protected any person from induction into a branch of the Armed Forces that restricted the "rights of its members to communicate directly with Members of Congress. . . ." 97 Cong. Rec. 3776 (1951). After the Chairman of the Armed Services Committee pointed out that the Navy did not induct its members, *ibid.*, the proposal was amended to substantially its present form, *id.*, at 3877, 3883. Universal Military Training and Service Act of 1951, § 1 (d), 65 Stat. 78. The statute underwent minor revisions when codified in 1956. Act of Aug. 10, 1956, 70A Stat. 80. No change in substance was intended. See S. Rep. No. 2484, 84th Cong., 2d Sess., 19–21, 95–96 (1956); H. R. Rep. No. 970, 84th Cong., 1st Sess., 8–10, 85 (1955).

[18] Section 1034 stands in marked contrast to an analogous statute enacted about 40 years earlier in order to guarantee federal civil servants the right to petition Congress. That statute provides: "The right of employees, *individually or collectively,* to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." 5 U. S. C. § 7211 (1976 ed., Supp. II). (Emphasis added.)

Both Congress and this Court have found that the special character of the military requires civilian authorities to accord military commanders some flexibility in dealing with matters that affect internal discipline and morale. See, *e. g.*, *Middendorf* v. *Henry*, 425 U. S. 25, 37–40, 43 (1976); *id.*, at 49–51 (POWELL, J., concurring); *Parker* v. *Levy*, 417 U. S., at 756; *Orloff* v. *Willoughby*, 345 U. S., at 93–94.[19] In construing a statute that touches on such matters, therefore, courts must be careful not to "circumscribe the authority of military commanders to an extent never intended by Congress." *Huff* v. *Secretary of Navy*, 188 U. S. App. D. C. 26, 35, 575 F. 2d 907, 916 (1978) (Tamm, J., concurring in part and dissenting in part), rev'd, *post,* p. 453. Permitting an individual member of the Armed Services to submit a petition directly to any Member of Congress serves the legislative purpose of § 1034 without unnecessarily endangering a commander's ability to preserve morale and good order among his troops. The unrestricted circulation of collective petitions could imperil discipline. We find no legislative purpose that requires the military to assume this risk and no indication that Congress contemplated such a result.[20] We therefore decide

---

[19] See also *Curry* v. *Secretary of Army*, 194 U. S. App. D. C. 66, 595 F. 2d 873 (1979).

[20] Glines says DOD Dir. 1325.6, ¶ III (G) (1969), shows that the Department of Defense itself construes the statute more broadly. The directive, however, adds nothing to the statutory language or the legislative history. It simply says that the Uniform Code of Military Justice, Art. 138, 10 U. S. C. § 938, protects the "right of members [of the Armed Forces] to complain and request redress of grievances against actions of their commander." It then cites 10 U. S. C. § 1034 for the statement that "a member may petition or present any grievance to any member of Congress. . . ." In *Huff* v. *Secretary of Navy*, 188 U. S. App. D. C. 26, 32, 575 F. 2d 907, 913 (1978), rev'd, *post,* p. 453, the court concluded that this reference to § 1034 implied approval of group petitioning. But the regulations enforced in the Air Force and the other services demonstrate that the Department of Defense has construed its own directive otherwise. See *supra,* at 355–356, and n. 11.

that § 1034 does not protect the circulation of collective petitions within a military base.

## IV

We conclude that neither the First Amendment nor 10 U. S. C. § 1034 prevents the Air Force from requiring members of the service to secure approval from the base commander before distributing petitions within a military base. We therefore hold that the regulations at issue in this case are not invalid on their face. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, dissenting.*

I join my Brother STEWART's dissent on statutory grounds in Nos. 78–599 and 78–1006. Since that opinion does not command a Court, it is appropriate to express my view on the constitutional questions presented. I believe that the military regulations at issue are prohibited by the First Amendment; accordingly, I would hold them to be unconstitutional, and affirm the judgments of the two Courts of Appeals.

Two sets of military regulations are challenged. Respondents in *Huff* (No. 78–599), *post,* p. 453, attack Navy and Marine Corps regulations that require prior approval by commanding officers before the origination, distribution, or circulation of petitions or other written material on ships, aircraft, military installations, and "anywhere within a foreign country." Fleet Marine Force Pacific Order 5370.3 (1974). Respondent in *Glines* (No. 78–1006) challenges parallel Air Force regulations that require command approval before the

___

*[This opinion applies also to No. 78–599, *Secretary of Navy et al.* v. *Huff et al., post,* p. 453.]

distribution or posting of nonofficial printed material and for the circulation of petitions for signature.[1] Air Force Regs. 30–1 (9) (1971) and 35–15 (3)(a) (1970). Both the Navy and Marine Corps and the Air Force regulations authorize withholding of approval if the commander determines that distribution would pose a "clear danger" to loyalty, discipline, or morale of servicemen or if the distribution would "[m]aterially interfere" with military duties.[2] The Air Force regulations explicitly declare, however, that "[d]istribution or posting may not be prohibited *solely* on the ground that the material is critical of Government policies or officials." Air Force Reg. 35–15 (3)(a)(4). (Emphasis added.)[3]

## I

Respondents contend that the regulations impermissibly interfere with First Amendment rights to communicate and petition. That contention finds solid support in First Amendment doctrine as explicated in a variety of settings by decisions of this Court. These regulations plainly establish an essentially discretionary regime of censorship that arbitrarily deprives respondents of precious communicative rights.

The circulation of petitions is indisputably protected First Amendment activity. Petitioning involves a bundle of related First Amendment rights: the right to express ideas, see, *e. g.*,

---

[1] The Air Force regulations exempt from prior command approval the distribution of published material "through the United States mail or through official outlets, such as military libraries and exchanges. . . ." Air Force Reg. 35–15 (3)(a)(1) (1970). Department of Defense guidelines are to the same effect. DOD Directive 1325.6 (1969).

[2] In addition, the Navy and Marine Corps regulations bar circulation of material that advocates insubordination, disloyalty, mutiny, or desertion, that discloses classified information, that contains obscene matter, or that involves the planning of unlawful acts.

[3] A counterpart to this declaration is the statement in DOD Directive 1325.6, ¶ III (A)(3) (1969), that "[t]he fact that a publication is critical of Government policies or officials is not, in itself, a ground upon which distribution may be prohibited."

*Street* v. *New York,* 394 U. S. 576, 593 (1969); *Martin* v. *City of Struthers,* 319 U. S. 141, 143 (1943), the right to be exposed to ideas expressed by others, see, *e. g., Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969); *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965); *id.,* at 308 (BRENNAN, J., concurring); *Martin* v. *City of Struthers, supra,* at 143, the right to communicate with government, see, *e. g., Edwards* v. *South Carolina,* 372 U. S. 229, 235 (1963); cf. *Hague* v. *CIO,* 307 U. S. 496, 513 (1939) (Roberts, J.), and the right to associate with others in the expression of opinion, see, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 15 (1976); *Healy* v. *James,* 408 U. S. 169, 181 (1972); *NAACP* v. *Alabama,* 357 U. S. 449, 460 (1958).[4] The petition is especially suited for the exercise of all of these rights: It serves as a vehicle of communication; as a classic means of individual affiliation with ideas or opinions; and as a peaceful yet effective method of amplifying the views of the individual signers. Indeed, the petition is a traditionally favored method of political expression and participation. See, *e. g., United States* v. *Cruikshank,* 92 U. S. 542, 552–553 (1876); 2 J. Story, Commentaries on the Constitution of the United States 619–620 (Cooley ed., 1873); cf. *White* v. *Nicholls,* 3 How. 266, 289 (1845). Thus, petitioning of officials has been expressly held to be a right secured by the First Amendment.[5] *Bridges* v. *California,* 314 U. S. 252, 277 (1941).

This First Amendment shield for petitioning is impermissibly breached in at least three ways by the regulations before us.

---

[4] It may be that the Petition Clause, in some contexts, enhances the protections of the Speech Clause. There is no need, however, to explore the distinctive attributes of the Petition Clause in these cases, for conventional First Amendment analysis amply suffices to dispose of the constitutional issues presented here.

[5] Because the petition so effectively promotes a number of First Amendment interests—especially those that are associational in nature—petitioning is not merely fungible with other expressive activities.

*First.* By mandating that proposed petitions be subjected to command approval, the regulations impose a prior restraint.[6] See *Greer* v. *Spock,* 424 U. S. 828, 865 (1976) (BRENNAN, J., dissenting); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 552–553 (1975); *Times Film Corp.* v. *Chicago,* 365 U. S. 43, 45–46 (1961). Although the First Amendment bar against prior restraints is not absolute, *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 590 (1976) (BRENNAN, J., concurring in judgment), the Court has repeatedly emphasized that the prior censorship of expression can be justified only by the most compelling governmental interests, see, *e. g., Nebraska Press Assn.* v. *Stuart, supra,* at 558–559; *New York Times Co.* v. *United States,* 403 U. S. 713, 714 (1971) (*per curiam* opinion); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 715–716 (1931). Thus far, only the interest in averting a virtually certain prospect of imminent, severe injury to the Nation in time of war has been generally considered a sufficiently weighty ground for prior restraint of constitutionally protected speech.[7] See, *e. g., New York*

---

[6] The command-approval requirement is not simply a "time, place, and manner" regulation valid under the First Amendment. See *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 98 (1972). The constitutional touchstone of permissible time, place, and manner regulation is that it focus upon the circumstances—not the content of expression. *Id.,* at 99. The military regulations in these cases—facially and as applied—look to the content of petitions, as well as to the manner in which they are circulated.

[7] To be sure, we have upheld restraints directed against obscenity, *Times Film Corp.* v. *Chicago,* 365 U. S. 43, 47–48 (1961), or against so-called "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). Such restraints have been permitted on the theory that the censored expression does not enjoy First Amendment protection. We have always been careful to insist, however, that restrictions aimed at unprotected speech be carefully crafted and applied to avoid trenching upon

*Times,* 403 U. S., at 726–727 (BRENNAN, J., concurring); *id.,* at 730 (STEWART, J., concurring). The instant regulations, however, explicitly require commanding officers to suppress petitioning for reasons far less urgent than imminent, serious, peril to the United States or its citizens. The maintenance of military discipline, morale, and efficiency are undeniably important, but they are not always, and in every situation, to be regarded as more compelling than a host of other governmental interests which we have found insufficient to warrant censorship. See, *e. g., New York Times Co.* v. *United States, supra; Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969); see also *Buckley* v. *Valeo, supra.* Moreover, terms as amorphous as "discipline" and "morale" invite latitudinous interpretation that intolerably disadvantages the exercise of First Amendment rights. See *Procunier* v. *Martinez,* 416 U. S. 396, 415–416 (1974). As these very cases illustrate, the perceived threat to discipline and morale will often correlate with the commanding officer's personal or political biases.[8] See *infra,* at 372–373.

---

communication that comes within the ambit of the First Amendment. See, *e. g., Freedman* v. *Maryland,* 380 U. S. 51 (1965).

It has also been speculated that the direct, immediate threat of interference with the trial process might warrant a restraint upon constitutionally protected expression. *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 569–570 (1976) (dictum). But see *id.,* at 588, 594–595 (BRENNAN, J., concurring in judgment). Significantly, however, this Court has repeatedly rejected efforts to wield the judicial contempt power against expression that assertedly jeopardized the administration of justice. See *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 844–845 (1978); *Wood* v. *Georgia,* 370 U. S. 375 (1962); *Craig* v. *Harney,* 331 U. S. 367 (1947); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Bridges* v. *California,* 314 U. S. 252 (1941).

[8] Among the suppressed communications were a petition to a Congressman supporting amnesty for Vietnam War resisters and a leaflet outlining certain respondents' views about the constitutional rights of servicemen. Both were censored, the former because it "contain[ed] gross misstatements and implications of law and fact [and] impugn[ed] by innuendo the

*Second.*  The command-approval procedure implementing these regulations is seriously flawed.  Time and again, the Court has underscored the principle that restraints upon communication must be hedged about by procedures that guarantee against infringement of protected expression and that eliminate the play of discretion that epitomizes arbitrary censorship.  See, *e. g., Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 558–562; *Blount* v. *Rizzi,* 400 U. S. 410, 416–417 (1971); *Carroll* v. *President & Comm'rs of Princess Anne,* 393 U. S. 175, 181 (1968); *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *Bantam Books, Inc.* v. *Sullivan, supra,* at 70–71; cf. *Schneider* v. *New Jersey,* 308 U. S. 147 (1939).  We have identified specific safeguards that are indispensable if a system of prior approval is to avoid First Amendment pitfalls.  These include (1) the requirement that the burden of justifying censorship fall upon the censor, see *New York Times Co.* v. *United States, supra,* at 714; *Freedman* v. *Maryland, supra,* at 58, (2) the condition that administrative suppression must be subject to speedy judicial review, see *Blount* v. *Rizzi, supra,* at 417, and (3) the rule that those whose First Amendment interests are at stake be given notice and an opportunity to be heard during suppression proceedings, see *Carroll* v. *President & Comm'rs of Princess Anne, supra,* at 181–183; cf. *Procunier* v. *Martinez, supra,* at 417–419.

None of these safeguards is present under the prior command-approval scheme.  There is no indication that the burden of justifying censorship rests upon the authorities.  Not only does the commanding officer make his own determination to suppress, but also no provision is made for prompt judi-

motives and conduct of the Commander-in-Chief of the Armed Forces"; the latter because it was "by transparent implication, disrespectful and contemptuous of all of your superiors. . . ."  App. in No. 78–599, pp. 46–47, 50.  The petitioners conceded below that suppression of the leaflet was improper under military regulations.  Brief for Petitioners in No. 78–599, p. 8, n. 3.

cial review.[9]   And we search the regulations in vain for any provision affording the right to appear before the censoring officer to argue for approval.   Thus, the regulations utterly fail to meet even the minimum procedural dictates of the First Amendment; rather, as designed, they countenance the arbitrary and nonneutral suppression of communication by petition.[10]

*Third.*   The regulations demonstrably do not serve the military interests offered as their compelling justification, and for that reason alone violate the First Amendment.   If regulation of communicative rights is to be justified by a compelling governmental interest, the regulation must *precisely* further that interest; where constitutional rights are at stake, important ends do not sustain mismatched means.   See *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 563–567, 569; *Procunier* v. *Martinez, supra,* at 413.   In this respect, the regulations here plainly founder.   The most important purpose that can be posited for them is prevention of incitement to military disorder.   But if the danger of incitement necessitates prior clearance of servicemen's messages, it would be logical for the military to mandate preclearance of all messages, whether

---

[9] It is unnecessary to consider whether servicemen might challenge censorship decisions by bringing suits against their commanding officers. See *Huff, post,* at 457–458, n. 5.   The lack of provision for immediate judicial review is not cured by the possibility that an individual might assume the burden of commencing a collateral action.   Cf. *Blount* v. *Rizzi,* 400 U. S. 410, 418 (1971).   Moreover, it is unlikely as a practical matter that persons serving at sea or on foreign soil will have ready access to domestic federal courts.

[10] Again, the factual background of these cases is instructive.   Two respondents individually submitted a single leaflet for approval.   The commanding general denied one respondent permission to distribute the leaflet on base, because of its disrespectful and "contemptuous" tone. The same officer permitted the other respondent to circulate the identical leaflet outside the main gate.   App. in No. 78–599, pp. 36, 50.   Since the on-post/off-post distinction had not been considered dispositive with respect to other requests, see *id.,* at 44, 46–47, it is difficult to identify the principle underlying the differing decisions about the leaflet.

circulated by petition or disseminated orally. Since oral discussion is not subjected to preliminary censorship, doubt must be raised as to the urgency and the efficacy of such censorship when communication is by petition. In other words, inasmuch as the content of an oral communication may be identical to the content of a petition, there is no reason to single out petitions for a content-preclearance requirement.

The only rational basis for disparate treatment of petitioning and oral communication would be the presence of some danger *peculiar to the process of petitioning*. But petitioning differs from simple, oral expression only in that it involves an element of physical conduct. Insofar as that physical element of the petitioning process poses a greater threat of disruption than does simple verbal expression, recourse to content-neutral regulation of the time, place, and manner of circulation is surely an appropriate and sufficient alternative to suppression. By ordering prior official review of the content of petitions, these regulations are an excessive response to any distinctive problems of petitioning. Even the most important governmental purpose cannot justify a regulation that unduly burdens First Amendment liberties. See *Shelton* v. *Tucker*, 364 U. S. 479, 488–490 (1960).

## II

All that the Court offers to palliate these fatal constitutional infirmities is a series of platitudes about the special nature and overwhelming importance of military necessity.[11] *Ante,* at 353–354.

---

[11] The Court, *ante,* at 356, n. 13, also suggests that curtailment of First Amendment freedoms might be warranted inasmuch as service personnel are Government employees, citing *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973). That doctrine is inapposite. The predicate for upholding liberty restrictions as a condition of public employment must, at least in part, be the voluntariness of the decision to accept Government employment. At various times, however, this country has inducted citizens into military service as a matter of compulsion. Moreover, unlike other employees,

Military (or national) security is a weighty interest, not least of all because national survival is an indispensable condition of national liberties. See *United States* v. *Robel,* 389 U. S. 258, 264 (1967). But the concept of military necessity is seductively broad, and has a dangerous plasticity. Because they invariably have the visage of overriding importance, there is always a temptation to invoke security "necessities" to justify an encroachment upon civil liberties. For that reason, the military-security argument must be approached with a healthy skepticism: its very gravity counsels that courts be cautious when military necessity is invoked by the Government to justify a trespass on First Amendment rights.

Such skepticism lay at the heart of our decision in *New York Times Co.* v. *United States.* There, the Government urged that publication of the so-called Pentagon Papers would damage the Nation's security during a period of armed conflict. We rejected that assertion. 403 U. S., at 714. Separate opinions scrutinized the security argument, and declined to rely merely upon the Government's characterization of the interest at stake. *Id.,* at 719–720 (Black, J.); *id.,* at 722–724 (Douglas, J.); *id.,* at 726–727 (BRENNAN, J.); *id.,* at 730 (STEWART, J.); *id.,* at 731, 733 (WHITE, J.). Similarly, *United States* v. *Robel, supra,* at 263–264, spurned simple deference to "talismanic incantation[s]" of " 'war power.' " Analogously, we have stringently viewed the national-security argument when it has been proffered to support domestic warrantless surveillance. *United States* v. *United States District Court,* 407 U. S. 297, 320 (1972).

---

servicemen may not freely resign their posts should they decide to unburden themselves of restraints upon their freedom of expression.

It is also noteworthy that the statutory scheme considered in *Letter Carriers* permitted employees to "[s]ign a political petition as an individual," 413 U. S., at 577, n. 21, and evidently further allowed the full panoply of petitioning rights with respect to petitions addressed to the Federal Government, *id.,* at 572–574, 587–588 (appendix).

To be sure, generals and admirals, not federal judges, are expert about military needs. But it is equally true that judges, not military officers, possess the competence and authority to interpret and apply the First Amendment. Moreover, in the context of this case, the expertise of military officials is, to a great degree, tainted by the natural self-interest that inevitably influences their exercise of the power to control expression. Partiality must be expected when government authorities censor the views of subordinates, especially if those views are critical of the censors. Larger, but vaguely defined, interests in discipline or military efficiency may all too easily become identified with officials' personal or bureaucratic preferences. This Court abdicates its responsibility to safeguard free expression when it reflexively bows before the shibboleth of military necessity. Cf. *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 842–845 (1978).

A properly detached—rather than unduly acquiescent— approach to the military-necessity argument here would doubtless have led the Court to a different result. The military's omission to regulate the content of oral communication suggests the pointlessness of controlling the identical message when embodied in a petition. It is further troubling that these regulations apply to all military bases, not merely to those that operate under combat or near-combat conditions. The "front line" and the rear echelon may be difficult to identify in the conditions of modern warfare, but there is a difference between an encampment that faces imminent conflict and a military installation that provides staging, support, or training services. It is simply impossible to credit the contention that national security is significantly promoted by the control of petitioning throughout *all* installations.

Finally, and fundamentally, the Court has been deluded into unquestioning acceptance of the very flawed assumption that discipline and morale are enhanced by restricting peaceful communication of various viewpoints. Properly regulated as

to time, place, and manner, petitioning provides a useful outlet for airing complaints and opinions that are held as strongly by citizens in uniform as by the rest of society. The forced absence of peaceful expression only creates the illusion of good order; underlying dissension remains to flow into the more dangerous channels of incitement and disobedience. In that sense, military efficiency is only disserved when First Amendment rights are devalued.

## III

The Court egregiously errs in holding that *Greer* v. *Spock,* 424 U. S. 828 (1976), compels the validation of these regulations. I dissented in *Greer,* and continue to disagree with the decision in that case. But, in any event, *Greer* is not dispositive here; indeed, if it governs at all in these cases, *Greer* is authority that the regulations are constitutionally indefensible.

*Greer* arose because of the rejection by military authorities of Dr. Benjamin Spock's request to hold a Presidential campaign meeting and distribute campaign literature at Fort Dix. Although the case involved a number of Army regulations restricting various expressive activities—including regulations parallel to those before us now—the actual issue in *Greer* was the exclusion of a politically partisan campaign effort. And there were three critical elements in *Greer* that prompted the Court to sustain that exclusion:

First, the Court relied upon the proposition that civilians lack expressive rights on military reservations from which they can be excluded. Significantly, the previous decision in *Flower* v. *United States,* 407 U. S. 197 (1972) (*per curiam*), was distinguished on the ground that leafletting in *Flower* had taken place on a portion of Fort Sam Houston that had been effectively dedicated to public use.

Second, the Court noted that servicemen stationed at Fort Dix had easy access to off-base public fora where they could be exposed to communications by Dr. Spock and others. By the

same token, although not discussed in *Greer,* these off-base fora provided Dr. Spock with ample opportunity for expressive activity. Thus, from the standpoint of speaker and listeners, the Fort Dix regulations only effected a partial cutoff of communicative rights because other equivalent avenues of interchange remained open.

Finally, *Greer* repeatedly emphasized the lack of *any* claim that the Fort Dix regulations had been applied in biased fashion. It explicitly noted the complete absence of any question of "irrationa[l], invidiou[s], or arbitrar[y]" application of the Army regulations. 424 U. S., at 840. Accordingly, the Court did not confront the problem of official discrimination among political viewpoints. Indeed, *Greer* placed weight upon a perceived "American constitutional tradition" that the military be institutionally free of political entanglement, and that it avoid "the appearance of acting as a hand-maiden for partisan political causes or candidates." *Id.,* at 839.

These three predicates to *Greer* are wholly absent in the setting in which we review the regulations before us. On their face, and as applied in these cases, the regulations restrict the expressive activities of individuals who are mandatorily, not permissively, present on military reservations. For soldiers and sailors, as opposed to civilians, military installations *must be* the place for "free . . . communication of thoughts," *Greer* v. *Spock, supra,* at 838. Further, when service personnel are stationed abroad or at sea, the base or warship is very likely the *only* place for free communication of thoughts.[12]   Thus, in contrast to *Greer,* the regulations here permit complete foreclosure of a distinctive mode of expression by servicemen, who lack the civilian's option to depart the sphere of military authority.

These cases also differ from *Greer* because they exemplify

---

[12] The regulations permit commanding officers to restrain petitioning activities off-base in foreign countries.

pervasive official partiality in the regulation of messages.[13] The orders refusing command approval for respondents' petitioning or leafletting flowed from the obviously biased official judgment that the content was "erroneous and misleading commentary," App. in No. 78–599, p. 34, or that it "impugn[ed] by innuendo the motives and conduct" of the President, *id.,* at 46. Far from being evenhanded regulation, this sort of command judgment is quintessentially political; in suppressing communication that "impugns" Presidential conduct "by innuendo," military authorities entangle themselves in national politics. Since these cases involve discriminatory regulation of communication, *Greer's* assumption of military neutrality—and, consequently, *Greer's* result—cannot govern here. Actually, the "tradition of a politically neutral military," *Greer, supra,* at 839, strongly counsels invalidation of these regulations, which demonstrably encourage commanding officers to exercise personal political judgment in deciding whether to permit petitioning.[14]

Today's decisions, then, clash, rather than comport, with the underlying premises of *Greer* v. *Spock.* The Court unnecessarily trammels important First Amendment rights by uncritically accepting the dubious proposition that military security requires—or is furthered by—the discretionary sup-

---

[13] While the respondents in these cases mount a facial challenge to the military regulations, an appreciation of the theoretical dangers posed by the regulations is best gained by considering their operation in practice.

[14] Indeed, inasmuch as the regulations state that distribution or posting of petitions or other writings "may not be prohibited *solely* on the ground that the material is critical of Government policies or officials," Air Force Reg. 35–15 (3)(a)(4) (1970) (emphasis added), the implication is that prohibition may be partly based upon the fact that the material in question challenges Government policy or officials.

Further, at least one command response to a petitioning request indicates that the officer in charge considered his censoring function to include the duty to "afford proper guidance to the men under my command," App. in No. 78–599, pp. 46–47.

pression of a classic form of peaceful group expression. Service men and women deserve better than this. I respectfully dissent.

Mr. Justice Stewart, with whom Mr. Justice Brennan joins, dissenting.

The Department of the Navy used to have a regulation mandating that every communication to a Member of Congress from anybody in the Navy had to be forwarded through official channels, if the communication "affect[ed] the Naval Establishment." See 97 Cong. Rec. 3776 (1951). Congress was informed about this regulation in 1951, and its reaction was to enact a statute that currently reads:

> "No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States." 10 U. S. C. § 1034.

Today, the Court holds that this statute does not in any way protect the circulation by servicemen on United States military bases of petitions addressed to Members of Congress. Specifically, the Court holds that the statute does not apply to a military regulation requiring that the content of petitions addressed to Members of Congress be precleared,[1] even when

---

[1] On their face, the regulations at issue strongly suggest that the content of prospective petitions may be considered by the commanding officer in determining whether or not to grant servicemen permission to circulate the documents. Air Force Reg. 35–15 (3) (a) (1970) requires that, in order to obtain permission to circulate any petition, a serviceman must submit to his commander "[a] copy of the material with a proposed plan or method of distribution or posting. . . ." The regulation further provides that permission to distribute will be denied where the commander determines that "a clear danger to the loyalty, discipline, or morale of members of the Armed Forces, or material interference with the accomplishment of a military mission, would result." Finally, the regulation admonishes the commander that "[d]istribution or posting may not be

the petitioning activity occurs on a base located in a noncombat area in time of peace. To reach this result, the Court necessarily concludes either that petitions are not "communication[s]" within the meaning of § 1034 or that the compelled prescreening of petitions is not a "restrict[ion]" within the meaning of that statute. Since, in my view, each of these conclusions is at odds with the express language of the statute and with its legislative history, I respectfully dissent.

Section 1034 protects those servicemen who "communicat[e]" with Members of Congress. As the Court necessarily acknowledges, a letter bearing one signature is a "communication" protected by § 1034. Nothing in logic would suggest that such a letter forfeits the statute's protection simply by acquiring additional signatures. Accordingly, reason would indicate that petitions are a form of "communication" protected under § 1034: they are no more than letters bearing many signatures. Moreover, it seems clear that a serviceman "communicates' with his Congressman just as much when he signs a letter drafted by a third person as when he writes and signs that letter himself.

Yet the Court's opinion appears to conclude that petitions are not "communications" within the meaning of § 1034. To reach this conclusion, the Court relies on the statute's legislative history. As the Court points out, the specific situation brought to the attention of Congress in 1951 was that of a

---

prohibited *solely* on the ground that the material is critical of Government policies or officials." (Emphasis added.)

Any doubt that the regulations involved here permit the appropriate commanding officer to review the contents of prospective petitions is dispelled by what occurred in *Secretary of Navy* v. *Huff, post,* p. 453. There, a commanding officer, acting under the authority of similar regulations, prohibited the circulation of petitions because they contained "gross misstatements and implications of law and fact as well as impugning by innuendo the motives and conduct of the Commander-in-Chief of the Armed Forces. . . ."

serviceman who had been threatened with court-martial proceedings if he sent a letter to his Congressman without prior command approval. By enacting the predecessor of § 1034, Congress made clear that it wanted to prohibit this kind of restraint. But the legislative history cited by the Court shows that the purpose of the law was considerably broader than simply "to permit any man who is inducted to sit down and take a pencil and paper and write to his Congressman or Senator." 97 Cong. Rec. 3776 (1951).

The historic matrix of the law contains no suggestion that Congress intended § 1034 to cover no more than a letter written and signed by one individual person.[2] If anything is to be drawn from § 1034's history, it is that Congress intended to protect more than such single-signature letters. A precise and particularized problem was brought to the attention of Congress in 1951, one that could easily have been remedied by a similarly circumscribed solution. Congress chose instead to write broadly so as to accord protection to all "communications" sent by military personnel to Members of Congress. Clearly, the legislative purpose was to cover the myriad of ways in which a citizen may communicate with his Congressman. By limiting the scope of § 1034 to the particular case brought to the attention of Congress in 1951, the Court, I think, reads the legislative history as mistakenly as it reads the language of the statute itself.[3]

---

[2] It is worth noting that nothing in § 1034's legislative history indicates that when Congress drafted that provision it had in mind the slightly different wording of 5 U. S. C. § 7211 (1976 ed., Supp. II), which explicitly protects the petitioning rights of federal civil servants.

[3] In support of its conclusion, the Court states: "The unrestricted circulation of collective petitions could imperil discipline. We find no legislative purpose that requires the military to assume this risk and no indication that Congress contemplated such a result." *Ante,* at 360. Contrary to the Court's implication, a reading of § 1034 to include petitions within that statute's ambit would not leave the military without the ability to protect its vital interests. The statute expressly permits the

The Court's opinion can be interpreted alternatively to hold that the regulations at issue do not constitute a "restrict[ion]" within the meaning of § 1034. That position also gives the statute an unjustifiably narrow scope. An absolute ban of petitions or petitioning activity on military bases would obviously constitute a "restrict[ion]."[4] The regulations before us amount to such a ban, but with one difference. They permit a limited exception for petitions whose content has been precleared by command authority. This kind of exception, however, is precisely the type of "restrict[ion]" on the free flow of communication between servicemen and Congress that the law prohibits. As stated by the law's sponsor, a requirement that a serviceman send his communications through channels "is a restriction in and of itself." 97 Cong. Rec. 3776 (1951).

That the preclearance regulations at issue here restrict the free flow of communication between servicemen and Members of Congress could not be more clearly demonstrated than by the facts presented in *Secretary of Navy* v. *Huff, post,* p. 453. There, servicemen invoked the preclearance procedures contained in similar regulations, but were denied permission to collect signatures on several petitions addressed to Members of Congress, which denials the Government now concedes were improper.[5] Not only did the prescreening procedure unjustifiably prevent the circulation of those particular petitions; it also necessarily discouraged further collective and individual

---

promulgation of rules regulating communicative conduct if "necessary to the security of the United States."

[4] Without some activity aimed at the acquisition of signatures, no petition could ever be created.

[5] Permission was denied to circulate a petition to Senator Cranston opposing the use of military personnel in labor disputes and a petition to Representative Dellums requesting amnesty for Vietnam war resisters, even though the requesters had stated that they would circulate the petitions out of uniform, during their off-duty hours, and away from the work areas of the base.

attempts by those servicemen to communicate with Congress.

It seems clear to me that the application of the challenged regulations in this case violated the provisions of § 1034. Under that statute only those rules that prohibit "unlawful" communications or that are "necessary to the security of the United States" may be enforced. No claim is made here that the communicative content of any of the respondent's petitions was in any way "unlawful." Moreover, no contention is made that the respondent disclosed anything secret or confidential in the proposed petitions to the Members of Congress.[6] And surely it could not conceivably be argued that, as a general proposition, a regulation requiring the preclearance of the content of all petitions to be circulated by servicemen in time of peace is "necessary to the security of the United States."

For these reasons, I believe that the judgment of the Court of Appeals should be affirmed.[7] Accordingly, I respectfully dissent from the opinion and judgment of the Court.

MR. JUSTICE STEVENS, dissenting.

The question whether 10 U. S. C. § 1034 includes a right to circulate petitions is not an easy one for me. I must confess that I think the plain language of the statute and its sparse legislative history slightly favor the Court's reading that it does not. Nevertheless, I agree with MR. JUSTICE STEWART's

---

[6] Congress included the "necessary to the security" exception in § 1034 so that the Government could prohibit servicemen from imparting "secret matter" in their communications with Congress. 97 Cong. Rec. 3877 (1951).

[7] The respondent was demoted to the standby reserves because he had failed to submit for preclearance a petition addressed to the Secretary of Defense as well as petitions separately addressed to various Members of Congress. While the latter petitions were protected by 10 U. S. C. § 1034, the former was not. I would nonetheless affirm the judgment of the Court of Appeals. There is no reason to believe that the respondent suffered the demotion only for his circulation of the petition addressed to the Secretary of Defense.

construction of the statute for two reasons. First, in a doubtful case I believe a statute enacted to remove impediments to the flow of information to Congress should be liberally construed. Second, the potentially far-reaching consequences of deciding the constitutional issue [1] counsel avoidance of that issue if the "case can be fairly decided on a statutory ground." [2] MR. JUSTICE STEWART has surely demonstrated that that test is met here. I therefore respectfully dissent.

---

[1] For the reasons stated by MR. JUSTICE BRENNAN, I do not consider the constitutional question foreclosed by the Court's decision in *Greer* v. *Spock*, 424 U. S. 828. Nor do I view it as so easy as to justify the novel practice of deciding the constitutional question before addressing the statutory issue. *Ante*, at 349.

[2] "Our settled practice . . . is to avoid the decision of a constitutional issue if a case can be fairly decided on a statutory ground. 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' *Spector Motor Co.* v. *McLaughlin*, 323 U. S. 101, 105. The more important the issue, the more force there is to this doctrine." *University of California Regents* v. *Bakke*, 438 U. S. 265, 411–412 (opinion of STEVENS, J.) (footnote omitted).